386 F.2d 855
 MAXWELL DYNAMOMETER COMPANY and Central Penn National Bank of Philadelphia for the Benefit of Lloyd R. Maxwell and Caroline L. Maxwell
v.
The UNITED STATES.
 No. 120-62.
 United States Court of Claims.
 November 9, 1967.
 
 COPYRIGHT MATERIAL OMITTED Harry E. Wood, Washington, D.C., for plaintiffs. Samuel D. Slade, Washington, D.C., atty. of record. Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.
 Charles B. Lennahan, Arlington, Va., with whom was Acting Asst. Atty. Gen., Carl Eardley, for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 PER CURIAM:
 
 
 1
 This case was referred to Trial Commissioner Franklin M. Stone with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on December 22, 1966. Exceptions were filed by defendant and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommended conclusion of law of the commissioner, with one modification, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth.
 
 
 2
 Proceedings in the instant case are hereby suspended for a period not exceeding 6 months from the date hereof to enable plaintiffs time to institute appropriate administrative proceedings, and to afford the Armed Services Board of Contract Appeals an opportunity to make a determination with respect to the amount to which plaintiffs are entitled. Plaintiffs shall, on or before the expiration of said 6-month period, submit a report to the court setting forth the results, or the then current status, of the further administrative proceedings before the Board.
 
 
 3
 Commissioner Stone's opinion,* as modified by the court, is as follows:
 
 
 4
 This action arises out of a Government contract under which the Maxwell Dynamometer Company (hereinafter sometimes referred to as "Maxwell Dynamometer" or "Maxwell"), a Delaware corporation with its principal place of business in West Chester, Pennsylvania, one of the plaintiffs herein,[1] agreed to build and deliver to defendant 15 multiple wheel drive vehicle chassis dynamometers.
 
 
 5
 Plaintiffs, by way of an assignment of errors, attack and seek review of a decision by the Armed Services Board of Contract Appeals (ASBCA) denying Maxwell's claim for extra expenses allegedly incurred in connection with the performance of the contract.
 
 
 6
 The only issue presented to the court for determination at this time is the question of liability. No de novo evidence was received in this proceeding and plaintiffs' claim is considered here solely on the basis of the pleadings, admissions, pretrial submissions of the parties, and the administrative record which includes, among other documentary material, the contract, transcript of the Board hearing, and the opinion-decision of the ASBCA.[2]
 
 
 7
 One must know just what a dynamometer is in order to understand this case, and furthermore, the significance of the facts set forth hereinafter will be better appreciated if an explanation of the manner in which a chassis dynamometer is utilized is made at this point. Simply put, a dynamometer is a mechanical device for measuring horsepower. A chassis dynamometer measures, among other things, the horsepower actually delivered to a highway by the revolving wheels of a vehicle. This measurement is effected by cradling the revolving wheels of the vehicle between pairs of steel rollers so that when the wheels are rotating, their motion is transmitted to the rollers of the dynamometer. The rollers in turn are connected by an axle to a power absorption unit to which is attached measuring devices to record speed and horsepower. As the power delivered by the wheels of the vehicle is transmitted to the rollers, a brake is applied thereto; the power absorbed as a result is then measured by the absorption unit. In each pair of rollers is a "power roller" to which the braking power is applied and an "idler roller" which rotates freely on its axle.
 
 
 8
 Although plaintiffs and defendant object on various grounds[3] to the other's narrative statements of the facts incorporated in the briefs respectively submitted by them, there does not appear to be a genuine issue of material fact in dispute between the parties as to the relevant events and actions which took place up to and including the time the parties entered into the contract here involved. In any event, while the following factual summary concerning such events and actions is not stated in the same words used by the ASBCA in its decision or limited to the facts found by the Board, the facts set forth here are either admitted by the pleadings, contained in the Board opinion, based upon undisputed substantial evidence which was before the Board, or supported by disputed evidence of such a nature that as a matter of law the Board could have made only one finding of fact with respect to the matter in question.[4]
 
 
 9
 Prior to the time defendant entered into the contract with plaintiff Maxwell, the U.S. Army had been using chassis dynamometers manufactured by the Clayton Dynamometer Company. A new set of specifications for the procurement of vehicle chassis dynamometers was prepared and distributed to the dynamometer industry by the Army; but apparently because members of the industry, including Maxwell, felt that the proposed specifications were too precise and detailed to allow sufficient competition among the manufacturers, the Army revised these specifications with a view toward affording greater latitude in design.
 
 
 10
 On August 19-20, 1958, an Industrial Conference[5] was held at the Rossford Ordnance Depot, Toledo, Ohio, for the purpose of discussing these new specifications. Representatives of six dynamometer concerns, including plaintiff Maxwell, its president, Lloyd R. Maxwell, two other Maxwell employees, and the Clayton Dynamometer Company (Clayton), as well as several Government personnel, attended this conference. For the most part, the conference consisted of a paragraph-by-paragraph consideration and discussion of the proposed specifications. It is apparent from the transcript of the discussions during the meeting that the Government intended to leave as much of the designing as possible to the successful bidder.
 
 
 11
 Considerable time was spent discussing the relatively small diameters required by the specifications for the dynamometer rollers.[6] Maxwell's president, Lloyd R. Maxwell, was especially critical of the specifications with respect to this particular item because he felt that at higher speeds the revolving vehicle wheels would deliver measurable power less efficiently to a small diameter roller.[7]
 
 
 12
 Another matter, among other things, considered was the requirement in the specifications that the preproduction sample had to be subjected to certain tests and that the acceptance or rejection of the preproduction model would be predicated entirely upon the information in the test report. The tests included, among others, the running of a heavy commercial vehicle capable of delivering 175 horsepower at 50 miles per hour to the dynamometer for 1 hour. When Maxwell, through its president, asked whether such a vehicle was available, it was assured by representatives of the Clayton Company and the Government that such equipment was in existence and that these tests had been run on a Clayton dynamometer. No question was raised at the conference as to how the 50 miles per hour was to be measured.[8]
 
 
 13
 On October 1, 1958, Rossford Ordnance Depot issued Purchase Description RFPD 175D for a chassis dynamometer. RFPD 175D provided in relevant part as follows:
 
 
 14
 1.6 Detail of components. — * * *
 
 
 15
 * * * * * *
 
 
 16
 1.6.3 Power absorption unit. — Power absorption capacity at each of the dynamometer set of rolls shall be at least 175 horsepower and shall be so designed as to permit changing from no load to full load, or to any intermediate load point and reach stabilization in not more than 10 seconds. The dynamometer shall be capable of returning to any pre-set load and speed, after speed variation, without manipulation of absorber controls. The capacity shall be such as to absorb power for testing vehicles at every speed from 10 to 50 miles per hour. The power absorption curve shall be capable of absorbing at least 8 horsepower at 10 miles per hour, 22 horsepower at 15 miles per hour, 55 horsepower at 20 miles per hour, 108 horsepower at 25 miles per hour, 135 horsepower at 30 miles per hour, 155 horsepower at 35 miles per hour, 175 horsepower at 40 miles per hour and 175 horsepower at 50 miles per hour. * * *
 
 
 17
 1.6.4 Speed. — The chassis dynamometer shall be capable of checking speeds of 4 to 75 road miles per hour under no load conditions.
 
 
 18
 * * * * * *
 
 
 19
 1.7.2 Dynamometer instruments. — * * * Each set [of instruments] shall include:
 
 
 20
 (a) 1 Double range direct-reading speedometer calibrated to show road speed from 0 * * * to 120 miles per hour * * *
 
 
 21
 (b) 1 Double range direct-reading horsepower meter calibrated to show road horsepower output from 0 to * * * 200 horsepower * * *
 
 
 22
 * * * * * *
 
 
 23
 2.5 Tests.
 
 
 24
 * * * * * *
 
 
 25
 2.5.2 Dynamometer test conditions. — The dynamometer * * * shall be used to test a commercial vehicle of a suitable horsepower to perform the tests listed in 2.5.3. The contractor shall supply the vehicle required for these tests. * * *
 
 
 26
 2.5.3 Commercial vehicle test. — The commercial vehicle shall be positioned on the rollers and subjected to test. The vehicle tested shall be on load for ten (10) minutes at each of the following conditions:
 
 
 27
 8 horsepower at 10 miles per hour 22 horsepower at 15 miles per hour 55 horsepower at 20 miles per hour 108 horsepower at 25 miles per hour 135 horsepower at 30 miles per hour 155 horsepower at 35 miles per hour 175 horsepower at 40 miles per hour
 
 
 28
 Each power absorption unit shall be subjected to the tests referenced above. Each power absorption unit shall be subjected to a one (1) hour endurance test during which it shall absorb 175 horsepower at 50 miles per hour. * * *
 
 
 29
 * * * * * *
 
 
 30
 Sections 1.6.3 and 2.5.3, supra, at least with respect to the requirement for tests at 175 horsepower at 40 and 50 miles per hour, were identical with the proposed specifications discussed at the August 1958 conference in Toledo. On October 7, 1958, defendant, through the Rossford Ordnance Depot, issued an Invitation for Bids for 15 chassis dynamometers in accordance with RFPD 175D. Maxwell's bid of $141,390 was accepted and it was awarded contract numbered DA-33-079-ORD-2457 on December 23, 1958. In addition to incorporating the customary "Changes" and "Disputes" clauses (Standard Form 32, October, 1957, Edition, "General Provisions (Supply Contract)"), the contract included, among other things, the following provision:
 
 
 31
 Contractor Conducted Test: The contractor will manufacture an acceptable preproduction sample, test, and submit a test report to the Government in accordance with the pertinent specifications in the contract within 100 days after award. Utilizing the information in the preproduction sample test report the Government will accept or reject the preproduction sample. * * *
 
 
 32
 Since Maxwell had never worked with or tested dynamometers with rollers as small in diameter as those required under the contract, the company began work immediately, even before it was awarded the contract.
 
 
 33
 The contract itself did not specify whether the speed indication for purposes of the endurance test required in paragraph 2.5.3 of Purchase Description RFPD 175D, supra, should be measured from the idler roller or the power roller; however, Maxwell's president, Mr. Maxwell, a conceded expert in the dynamometer field, assumed that these tests had to be taken from instruments attached to the power roller. In his opinion, to meet the specifications of paragraph 2.5.3 by measuring from the idler roller would be "to fraud the test."[9]
 
 
 34
 In February or March 1959, Mr. Maxwell and several of Maxwell's employees travelled to a Navy installation at Newport, Rhode Island, and made a detailed inspection of a chassis dynamometer manufactured by the Clayton Dynamometer Company which Maxwell knew was similar to that which the Army was then using. The purpose of making this trip and inspection study was to acquaint employees in Maxwell's organization with the multiple axle dynamometer, since many of its staff had never seen one. During the course of the inspection, Maxwell, for the first time, became aware that the speed measurements on the Navy's dynamometer were determined by tachometer generators attached to the idler rollers.[10] Maxwell's employees regarded this as an "engineering error" (see note 9); but the record does not disclose that anything was ever said by a Maxwell employee or representative to defendant about measuring from the idler roller rather than the power roller. The discovery that the Clayton Dynamometer Company and the Navy were taking speed readings from the idler, rather than the power, roller did not result in any change in Maxwell's interpretation of RFPD 175 D, supra, since, in Mr. Maxwell's view, readings so taken would not show "road speed" or "horsepower," as he interpreted sections 1.6.4 and 1.7.2 thereof to require. Accordingly, Maxwell continued work on its preproduction sample dynamometer.
 
 
 35
 As indicated in the contract provision entitled "Contractor Conducted Test," supra, Maxwell was required to test its sample dynamometer and submit a test report to the Government, in accordance with the pertinent contract specifications. On May 27-29, 1959, Maxwell subjected its sample dynamometer to all of the required tests, except the endurance test, at Maxwell's plant in West Chester in the presence of several representatives of the Rossford Ordnance Depot and the Philadelphia Ordnance District (within which Rossford was presumably located). During the tests, both speed and horsepower were measured with devices attached to the power roller. None of the Government representatives present said anything about this fact to any of Maxwell's people. Maxwell's sample dynamometer satisfied, with a few relatively minor exceptions, the tests required by the contract; however, as indicated above, Maxwell was not able to subject its sample dynamometer to the endurance tests requiring delivery of 175 horsepower at 40 and 50 miles per hour.
 
 
 36
 Maxwell submitted a test report which, for the reason explained above, did not include the required endurance test. Undisputed documentary evidence in the record shows that on June 10, 1959, the Philadelphia Ordnance District office sent a letter to Maxwell, based upon a report received from the Rossford Ordnance Depot, reflecting Rossford's "evaluation and recommendations as a result of witnessing the preproduction tests." This letter noted a number of defects, stated that certain items were unacceptable for specified reasons, made several suggestions, requested Maxwell to take particular actions, and contained numerous comments;[11] but it is significant to note that no mention was made of Maxwell's measuring speed from the power roller. The letter also included the following statement:
 
 
 37
 Recommendation with regard to acceptability of the preproduction sample is held in abeyance pending review of format test report, since not all the specified tests were performed. It is noted in particular that the endurance test per paragraph 2.5.3 of RFPD 175D has not as yet been run.
 
 
 38
 In connection with the above quote, it should be noted that the Board's decision stated that "* * * it was recommended [presumably by Rossford], with regard to acceptability of the preproduction sample, that approval be held in abeyance pending review of a formal test report, since the endurance test had not been performed." (Emphasis supplied.)
 
 
 39
 It is apparent from the above-mentioned letter of June 10, 1959, and the Board's decision that the primary concern of the Government was the fact that Maxwell's sample dynamometer had not been subjected to the endurance test, rather than that certain other tests had not been met in a completely satisfactory manner. Yet, despite the importance which the Government placed on the endurance test and although defendant's representatives were aware that Maxwell had measured speed from the power roller, it is emphasized that the latter fact was not mentioned in the letter of June 10, 1959. (See note 11.)
 
 
 40
 A conference was held at the Philadelphia Ordnance District on June 11, 1959, at which time Maxwell and Government representatives discussed the possibility of substituting a stationary engine in place of the commercial vehicle required under the contract, since such an engine could be coupled directly to the power absorption unit rather than placed on the dynamometer rollers and thus would eliminate any problem of slippage.[12]
 
 
 41
 In a letter directed to the Philadelphia Ordnance District, under date of June 15, 1959, Maxwell requested that the prescribed commercial vehicle endurance tests be waived with a corresponding reduction in the contract price. This request was denied in a letter to Maxwell, dated July 1, 1959; but the Government indicated therein that consideration would be given to "the 175 h.p. test requirements if requested by you, to the extent that the test be made with an engine coupled directly to the absorber unit and capable of developing 175 h.p. in lieu of vehicle."[13]
 
 
 42
 In June 1959, Maxwell requested a contract extension. During the month of July of that year, such an extension of time for the testing of the preproduction sample and the submission of the test report was granted.[14] Also, the contract was further modified by mutual agreement of the parties by a provision which permitted approval of the preproduction sample either on the basis of the test report "and/or by visual inspection," whereas the original contract contemplated examination of the test report only.
 
 
 43
 Throughout June and July 1959, Maxwell attempted to improve its sample dynamometer and to locate a commercial truck capable of delivering the stipulated 175 horsepower at 50 miles per hour, so that a test report taking the speed reading from the power roller could be furnished to the contracting officer. On July 28, 1959, Maxwell transported its sample dynamometer to the Cummins Diesel Engines plant (Cummins) in Baltimore, Maryland, where it was coupled to a stationary 275 horsepower engine and tested. Since there could be no slippage problems, the sample dynamometer satisfactorily performed all its tests. Although advance notice of the tests had been given to the Government, none of its representatives were present at the time the tests were given.
 
 
 44
 On July 31, 1959, in the presence of several representatives of the Government, Maxwell attempted to perform the prescribed 1-hour endurance test on its sample dynamometer by the use of a White Motor Company 275 horsepower Diesel engine. The test was a failure, the vehicle being unable to transmit to the dynamometer the required 175 horsepower at 50 miles per hour. The speed was measured from the power roller during the test and again the Government representatives in attendance said nothing about this fact. Thereafter, on the same date, Maxwell submitted its "final" test report and a renewed request for contract deviation approval with respect to the specified commercial vehicle tests at 175 horsepower at 40 and 50 miles per hour, stating that it was unable to obtain a vehicle capable of delivering "175 HP for 1 hour" and asking permission to conduct the endurance test with a stationary engine. A certificate authenticated by the Cummins Company that the sample dynamometer had already passed the endurance test on July 28, 1959 when coupled to such an engine, accompanied this request. By letter dated August 25, 1959, the Government advised Maxwell that its request for deviation had been denied for the stated reason that the contractor had access to a vehicle of adequate horsepower capacity to perform the endurance test.
 
 
 45
 Insisting that the cause of its difficulties was the slippage at higher speeds from the small size and smoothness of the rollers, Maxwell still continued its efforts to find an appropriate commercial vehicle capable of performing the endurance tests. Finally, on September 22, 1959, Maxwell asked the Army to supply such a vehicle. On September 24, 1959 the Government advised Maxwell that the International Harvester Company in Philadelphia, Pennsylvania, had a vehicle which could deliver the requisite 175 horsepower at 50 miles per hour for 1 hour. Maxwell procured this vehicle and on September 30, 1959, ran a series of tests, including an effort to perform the specified endurance requirements, in the presence of several Government representatives. The vehicle failed, like the others, to deliver sufficient power to the power roller at 50 miles per hour when the speed was read from the power roller. Apparently, Maxwell was not informed that its method of measuring speed and horsepower was in error. It should be noted that during this test, Maxwell attached tachometers to both the idle roller and the power roller with the result that at speeds in excess of 35 miles per hour, the idler roller revolved at substantially higher speeds than the power roller. Also, at these test runs, the same vehicle was tested on a competitive dynamometer and 170 horsepower was absorbed at 66 miles per hour with the speed presumably taken from the idler roller.
 
 
 46
 Commencing on September 29, 1959, and continuing through October 1, 1959, representatives from Rossford, Philadelphia, and other offices conferred with Maxwell concerning the evaluation of Maxwell's preproduction sample. On October 1, 1959, an Army Ordnance Report was issued which reads in pertinent part:
 
 
 47
 Because of the unavailability along the Eastern Seaboard of the United States of a vehicle with demonstrated capacity of producing at the wheels 175 HP at 50 MPH, it is necessary to re-evalue the specifications. The Contractor had secured and tested three vehicles all of which were rated by their manufacturers to be capable of producing in excess of the above requirements and all of which failed to produce the desired Horsepower and speed output.
 
 
 48
 Government engineers have determined that the tests performed, when considered as a whole, meet the requirements of the specifications. There is no doubt in the opinion of the technical people that the unit demonstrated its ability of meeting the intent and purpose of specification requirements.
 
 
 49
 * * * there is no doubt that this unit can, if a vehicle of adequate capacity were available, satisfactorily test said vehicle within said specification.
 
 
 50
 By letter dated October 2, 1959, the Army advised Maxwell that its preproduction sample had been accepted (subject to the accomplishment of certain minor corrections specified in the letter which did not include performance of the 175 horsepower at 40 and 50 miles per hour) on the basis of the information obtained "on 30 September 1959," and requested Maxwell to make deliveries as promptly as possible and to forward a schedule of deliveries immediately. Maxwell completed and delivered all the remaining dynamometers by February 10, 1960.
 
 
 51
 On August 10, 1959, Maxwell began sending weekly bills to the contracting officer asking reimbursement for its daily overhead and payroll expense at the rate of $800 per day "in connection with performance of the contract on the grounds that such expenses were covered by faulty specifications which were impossible of performance."[15] The contracting officer disallowed payment on these various invoices and they were returned to Maxwell on October 8, 1959, apparently by the Philadelphia Ordnance District, with advice to the effect that this was being done on the grounds that "[u]nder the terms of the Contract there exists no provision for any such payment; nor does the Contracting Officer have any authority to otherwise approve such a payment." Maxwell timely appealed this decision, as well as decisions of the contracting officer dated August 25, 1959, refusing to accept Maxwell's sample dynamometer, and rejecting its July 31, 1959 request for deviation approval, to the Armed Services Board of Contract Appeals. After a hearing on all these appeals, the Board, in a decision dated December 27, 1960 (ASBCA Nos. 5974 and 6055), denied them "in their entirety," holding that the contract specifications permitted speed measurement for purposes of the requisite endurance tests from the idler roller, that Maxwell was aware of this fact because of observations made by its representatives at the Navy installation at Newport, Rhode Island, in February or March 1959, mentioned hereinbefore, that, as a result, by attempting to measure speed from the power roller, Maxwell was doing more than the contract called for, and that, therefore, Maxwell was not entitled to recover for its extra expenses.
 
 
 52
 Maxwell timely filed its petition herein on April 20, 1962. Subsequently (as explained in note 1), an amended petition was filed, which included another plaintiff.
 
 
 53
 Preliminary to discussing the decision of the ASBCA on the merits of Maxwell's claims, it should be noted that the opinion of the Board stated, with respect to its jurisdiction to consider Maxwell's claim on appeal, the following:
 
 
 54
 By written motion to dismiss and answers filed in response to the contractor's complaints, and by oral motions to dismiss made at the hearing of these appeals, the Government asserts that the contractor is only seeking to recover unliquidated damages for delay and that claims of such character are not cognizable by either the contracting officer or this Board. The gist of the contractor's complaints involves claimed impossibility of performance of a portion of the contract specifications, which put the contractor to expense over and above that which the contract reasonably contemplated the contractor should bear. Decisions with respect to the Government's various motions were reserved. All of such motions are hereby denied for the reason that the claims asserted could well entitle the contractor to reimbursement of expense to which it would not have been put except for faulty specifications.
 
 
 55
 As indicated hereinbefore (see note 2), plaintiffs, in substance, allege in their amended petition that they are entitled to recover damages by reason of the fact that certain specified acts of commission and omission on the part of the Government constituted breaches of the contract here involved, and that, therefore, the decision of the Board is not entitled to finality because it did not have authority to determine questions of law. Plaintiffs also make assertions indirectly indicating that, alternatively, Maxwell should have been given an equitable adjustment, and that any decisions made by the contracting officer and the Board on matters properly within the scope of their authority are not binding on the court because such decisions were arbitrary, capricious, and not supported by substantial evidence.
 
 
 56
 In their assignment of errors, plaintiffs first contend that the test requirements contained in the contract specifications were impossible of performance because there was no commercial vehicle capable of delivering, at the wheels, 175 horsepower at speeds of 40 and 50 miles per hour to power rollers of the size prescribed by the specifications. Alternatively, plaintiffs contend that the specifications were faulty and ambiguous with regard to the method of taking measurements from the dynamometer, that Maxwell reasonable interpreted the specifications as requiring measurements to be taken from the power roller of the dynamometer, and that, as so interpreted, the test requirements of the specifications could not be met. Plaintiffs request the court to hold that they are entitled to recover full damages as a result of defendant's breaches of contract, or to judgment under the Changes clause of the contract for all increased costs and expenses incurred in consequence of defendant's alleged defective and ambiguous specifications.
 
 
 57
 Defendant does not renew in this proceeding the position advanced by the Government during the course of the administrative proceeding below that Maxwell's claims were such that neither the contracting officer nor the ASBCA could consider them. Nor does defendant contest the Board's decision on that or any such grounds. To the contrary, it is implicit from defendant's answer and response to plaintiffs' assignment of errors that defendant considered the Board to have acted properly in holding a hearing and making factual determinations with respect to the claims asserted by Maxwell. It is the position of the defendant, in brief, that the ASBCA was correct in concluding that the contract requirements were possible to perform, and that Maxwell erred in interpreting the specifications to require that both speed and horsepower be measured from the power roller; that the Government was justified in not accepting Maxwell's preproduction sample dynamometer because it failed to meet the commercial vehicle test, as well as other specifications; that the specifications did not require the contractor to equip the dynamometers with rollers in any particular diameter; that the Board was correct in concluding that Maxwell was in a position to furnish the required endurance test report and that Maxwell increased the contract's requirement by insisting that the specifications required that the report be based on measurements from the power roller; that the decision of the Board rests upon factual rather than legal considerations and that these factual decisions should be considered final under the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964 ed.), or, in the alternative, if any of the factual matters presented are determined to be legal questions the Board's decisions as to these points were correct.
 
 
 58
 The Board's conclusions, determinations, and decisions turned on its interpretation of the contract specifications. Since the basic and ultimate issue involves interpretation of the contract specifications which is a question of law, the Board's decision with respect thereto is not entitled to finality under the Wunderlich Act, supra, and we are not bound by the Board's determination. Therefore, the court is free to re-examine the question and reach its own conclusion as to what the contract required. See, e.g., Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 964, 171 Ct.Cl. 478, 481 (1965); C.J. Langenfelder & Son v. United States, 341 F.2d 600, 609, 169 Ct. Cl. 465, 480 (1965); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 974, 169 Ct.Cl. 384, 386 (1965); Wingate Constr. Co. v. United States, 164 Ct.Cl. 131, 138 (1964).
 
 
 59
 The initial question to be resolved is whether the contract, for purposes of the endurance test, required that speed be measured from the power roller or from the idler roller. As previously indicated, plaintiffs contend that the contract, when properly construed, required that the speed be measured from the power roller; whereas, defendant, on the other hand, maintains that it was permissible under the specifications for Maxwell to measure speed from the idler roller. The contract itself does not specifically state how the speed should be measured. When faced with a situation such as this, the court has long recognized the principle that where the Government draws specifications which are susceptible to more than one interpretation and the contractor's interpretation is both fair and reasonable, this court will uphold the contractor's construction of the contract. Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876-877, 163 Ct.Cl. 1, 6 (1963); Jefferson Constr. Co., v. United States, 151 Ct.Cl. 75, 84 (1960); Randolph Eng'r. Co. v. United States, 367 F.2d 425, 429-430, 176 Ct.Cl. 872, 880, (1966).
 
 
 60
 Viewed in the context of what transpired at the Industrial Conference held in August 1958, and the language used in the specifications, Maxwell's interpretation of the contract requiring it to measure speed from the power roller seems eminently fair and reasonable. Maxwell's reading of the specifications was based on the distinction between road speed and wheel speed. The latter is the speed at which a vehicle's wheels are spinning and is usually indicated by the vehicle's speedometer. Wheel speed is measured from the idler roller since that is a freely rotating mechanism. Road speed, however, is the actual linear rate of speed at which a vehicle would travel, and such speed is measured from the power roller.
 
 
 61
 The specifications themselves speak in terms of road speed. Section 1.6.4 of RFPD 175D, supra, provides that the chassis dynamometer "shall be capable of checking speeds of 4 to 75 road miles per hour" [emphasis supplied]; section 1.7.2 states that each set of dynamometer instruments shall include a speedometer calibrated to show "road speed" and a horsepower meter calibrated to show "road horsepower output." [Emphasis supplied.] Moreover, at the Industrial Conference itself, when one of Maxwell's representatives asked whether the specifications referred to "engine-delivered horsepower or * * * horsepower delivered at the road by the vehicles to be tested," the Government representative answered: "This is at the road wheel."
 
 
 62
 Regardless of the reasonableness of Maxwell's literal interpretation of the contract, defendant, and the Board in its opinion, stress that as a result of Maxwell's inspection of the Clayton chassis dynamometer at the Naval installation in Newport, Rhode Island, Maxwell was put on notice that the Government would accept a dynamometer which measured speed from the idler, rather than the power, roller. Defendant contends that by ignoring this fact, and by continuing to test from the power roller, Maxwell's interpretation of the contract specifications was no longer reasonable. Maxwell's failure to point out this discrepancy between the manner in which speed was measured from the Clayton dynamometer and the "similar" dynamometer which it contracted to build and deliver is somewhat questionable. Cf. Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 6-7 (1963); Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 328 (1958). Maxwell's excuse that it thought such measurement was an engineering error and a fraud is not entirely persuasive. Regardless of the technical soundness of the Government's requirements, a contractor must comply with them and cannot substitute its own views for those of the Government. Farwell Co., Inc. v. United States, 148 F.Supp. 947, 949, 137 Ct.Cl. 832, 836 (1957); H.L.C. & Associates v. United States, 367 F.2d 586, 598, 176 Ct.Cl. 285, 306 (1966).
 
 
 63
 However, the reasonableness of Maxwell's actions in disregarding what it observed in Newport must be weighed against the Government's action throughout the testing period. During the tests in late May of 1959, when the dynamometer failed to meet the test requirements for the first time, Maxwell measured speed from the power, rather than the idler, roller and the Government made no objections or even commented on this fact. Defendant protests that it was not the Government's job to determine the cause of the failure to meet the contract requirements and that it was only obligated to advise Maxwell that the requirement had not been satisfied. But this argument is contradicted by the very fact that the Government did offer many suggestions and comments about improving the sample dynamometer; yet it never once mentioned the known fact that Maxwell was measuring speed from the wrong roller. (See note 11.)
 
 
 64
 The Government also contends that it was never aware that Maxwell was construing the contract as requiring it to measure speed from the power roller and that it thought Maxwell realized that it could also measure from the idler roller. This may have been so — until after the tests on May 27-29, 1959 — but the record belies this assertion after that time. Government representatives were present during these tests and they unquestionably observed Maxwell's attempts to measure both speed and horsepower with devices attached to the power roller. In light of this fact, it is significant that the letter sent to Maxwell by the Philadelphia Ordnance Depot under date of June 10, 1959, refers to Maxwell's report covering this test. The Government's letter indicates that it was based upon a report received from the Rossford Ordnance Depot reflecting Rossford's "evaluation and recommendations as a result of witnessing the pre-production tests," and makes particular note of the fact that the endurance test had not been run. But it does not mention Maxwell's efforts to measure speed from the power roller. Furthermore, as the Board itself noted in its decision, there is a conversation record of a telephone conference that occurred on July 17, 1959, between the Government and Maxwell's president, Mr. Maxwell. After the latter reiterated the inability of his company to obtain a commercial vehicle capable of producing 175 horsepower at 50 miles per hour, it is reported that he said that at a forthcoming test (which was eventually held on July 31, 1959), "he would connect tachometers to both rolls of the dynamometer for the purpose of illustrating to Rossford that the 175 horsepower at 50 miles per hour may be measured by obtaining speed reading from Idler roller. * * * [A]ny measurement which was made would be inaccurate but he would make such readings for the edification to the Rossford personnel."[16]
 
 
 65
 The foregoing indicates that the question of which roller the speed had to be measured from should have become apparent to the Government and that it was then placed on some form of notice that Maxwell felt it was required to measure from the power roller only. Certainly, as a result of the tests made in late May, the conference held on June 11, the telephone conference on July 17, 1959, and the known efforts of Maxwell to locate a vehicle that was capable of passing the endurance test by using the power roller, the Government became aware of Maxwell's problem and was alerted to this question. Despite these facts, at the tests conducted on July 31, 1959, run in the presence of Government officials, no objections or comments were made by them concerning Maxwell's method of measuring from the power roller. And after the test, Mr. Maxwell had a "blackboard talk" with these officials and explained to them why slippage made the satisfaction of this endurance test impossible (slippage being a problem only when measurement is made from the power roller), and no one took issue with this assertion. Again, at another test run on September 30, 1959, in the presence of Government representatives, no mention or criticism was made of Maxwell's measuring from the power roller. In fact, at this test, Maxwell attached tachometers to both rollers in order to show that at higher speeds the idler roller revolves at substantially higher speeds than does the power roller, presumably because of the lack of slippage. The record is devoid of any indication by the Government to Maxwell that measurement from the idler roller would be sufficient and that it was not necessary to perform the test by measuring from the power roller.
 
 
 66
 Either of two conclusions can be reached from the Government's actions. One is that the Government's officials at these tests interpreted the contract in the same manner as Maxwell and thought the contract required that speed be measured from the power roller, the Clayton dynamometer at Newport notwithstanding. Since great weight is given to the practical interpretation of a contract by the parties to it before the contract becomes the subject of controversy, if such is the case, then it reinforces Maxwell's interpretation of the specifications. Crown Coat Front Co. v. United States, 292 F.2d 290, 292-293, 154 Ct.Cl. 613, 617 (1961); Blanchard v. United States, 347 F.2d 268, 273, 171 Ct.Cl. 559, 566 (1965); Chase & Rice, Inc. v. United States, 354 F.2d 318, 322, 173 Ct.Cl. 740, 746 (1965). The other conclusion is that the representatives of the Government were aware Maxwell was reading the contract specifications more stringently than required, but that they said nothing, possibly in the hope that Maxwell would be able to meet this more demanding standard. Such action is unconscionable and would not serve to defeat plaintiffs' interpretation. Cf. David J. Joseph Co. v. United States, 82 F.Supp. 345, 351, 113 Ct.Cl. 3, 13 (1949); Universal Sportswear, Inc. v. United States, 180 F.Supp. 391, 394, 145 Ct.Cl. 209, 213-214 (1959).
 
 
 67
 Thus, it is concluded as a matter of law that Maxwell's reading of the contract requiring it to measure speed from the power roller was a reasonable one and, therefore, it is binding on the defendant. Given this interpretation of the contract, the question then becomes whether these specifications were capable of being performed, or whether they were factually impossible to comply with, thereby entitling plaintiffs to recover the costs incurred by Maxwell incident to its attempts to comply with these defective specifications. See Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966). Such a question is one of fact and not of law. Ordinarily it would be decided in the first instance by the particular Board of Contract Appeals which held the administrative hearing. Cf. River Constr. Co. v. United States, 159 Ct.Cl. 254, 262-263 (1962); Mitchell Canneries, Inc. v. United States, 77 F.Supp. 498, 503, 111 Ct. Cl. 228, 249 (1948). Unfortunately, although much evidence relevant to this question was introduced at the hearing before the Board below in this case, it made no finding as to whether, if speed is measured from a power roller 8½ inches in diameter, it was possible to meet the contract requirement that the dynamometer be subjected to a 1-hour endurance test during which it shall absorb 175 horsepower at 50 miles per hour, since under the Board's interpretation of the contract it never had to pass on this question.
 
 
 68
 Where an administrative board has failed to make a relevant finding of fact as to which the evidence is undisputed, this court has made such finding rather than referring the matter to the board. Kraus v. United States, supra (see note 4). Likewise, where the evidence is disputed but it is of such a nature that as a matter of law the Board could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the Board for determination of the factual issues;[17] otherwise, litigation would be protracted and unnecessary delay and expense would result simply in order to have the Board formally decide a fact which legally can be decided in only one way. Such an empty ritual has no place in a rational decision-making process.
 
 
 69
 Applying this principle to the facts at hand, it is clear as a matter of law that it was factually impossible to meet the endurance test requirements when measuring speed from the power roller. This conclusion is supported by substantial evidence of record introduced by Maxwell at the hearing before the Board. First, there are Maxwell's own experiences in testing the dynamometer. The power curves of all the vehicles used indicate that the engines should have had no problem in producing the requisite horsepower and speed;[18] however, when the dynamometer was actually tested with these vehicles, it failed to absorb what the engine was evidently producing. Especially noteworthy is what occurred on July 28, 1959, at the Cummins plant in Baltimore. When tested on a stationary engine — thus eliminating any problem of slippage — Maxwell's preproduction sample dynamometer easily met the endurance test requirements. But, when tested with a comparable engine only 3 days later, the dynamometer was unable to absorb 175 horsepower at 50 miles per hour for 1 hour. Finally, Maxwell offerred letters from five of the leading truck manufacturers who regularly used dynamometers, all five of which contained statements to the effect that the slippage resulting from dynamometer rollers as small as 8½ inches in diameter made the absorption of 175 horsepower at 50 miles per hour for 1 hour impossible.
 
 
 70
 Defendant's rebuttal to the foregoing fails to answer Maxwell's proof. At the Board hearing defendant introduced test reports relating to two different dynamometers which allegedly had complied with the requirements that Maxwell's dynamometer had failed to meet. But both of these dynamometers measured speed from the idler roller which is quite different than the contract requirement in this case that speed had to be measured from the power roller. Defendant also introduced a letter from a truck manufacturer containing statements to the effect that it should be no problem for a dynamometer to absorb 175 horsepower at 50 miles per hour for 1 hour. The letter, however, makes no mention to the size of the dynamometer rollers. This is critical. The larger the dynamometer rollers, the less slippage there is; in fact, Maxwell itself had tested dynamometers which absorbed over 200 horsepower — using rollers of substantially larger size than those required by the contract. Thus, by failing to specify what size dynamometer rollers it had in mind, the letter relied upon by defendant is of no relevance.[19]
 
 
 71
 Defendant also stresses, as an admission against interest, that a brochure issued by Maxwell after the performance of the contract indicated that Maxwell's dynamometers were capable of absorbing 275 horsepower at up to 90 miles per hour even with 8½ inch rollers. But this, too, is irrelevant. The brochure quite plainly states that it was referring to tests made by stationary engines — quite a different thing than the tests required under the contract. Lastly, it should be noted that defendant appears to actually concede in its brief that "Maxwell and the defendant seem to have agreed that the test report could not be furnished if the power roller were used * * *." [Emphasis in original.]
 
 
 72
 Defendant also raises the argument that regardless of the inability of Maxwell to satisfy the endurance test requirements, the preproduction sample dynamometer also failed to satisfy other specifications. This contention is not borne out by the record. Although Maxwell's dynamometer was found to have several deficiencies during the May 1959 tests (see note 11), these were relatively minor ones (with the exception, of course, of the failure to meet the endurance test requirement) and they were corrected by early June 1959. The course of dealings between the parties from early in June 1959, until October 2, 1959, when the Government notified Maxwell that its preproduction sample dynamometer had been accepted (subject to minor changes) and requested delivery of the dynamometers, reveal that the failure of the sample dynamometers to absorb 175 horsepower at 50 miles per hour for 1 hour was the sole reason for the failure of the Army to accept Maxwell's dynamometer at an earlier date. The dynamometers the Government finally accepted under the contract were essentially the same as Maxwell's preproduction sample dynamometer as it existed in June 1959.
 
 
 73
 Thus, the contract must be construed as requiring that speed be measured from the power, rather than the idler, roller, and, given the requirement that the rollers be no more than 8½ inches in diameter, it was factually impossible for the dynamometer to comply with the contract specification that it absorb 175 horsepower at 50 miles per hour for a period of 1 hour. Accordingly, plaintiffs are entitled to judgment for the increased costs and expenses which Maxwell incurred in attempting to comply with this requirement. See Hol-Gar Mfg. Corp. v. United States, supra, 360 F.2d at 638, 175 Ct.Cl. at 524, where the court stated:
 
 
 74
 The Armed Services Board of Contract Appeals has recognized the correctness of the allowance of costs incident to an attempt to comply with defective specifications. See, e.g., J. W. Hurst & Son Awnings, Inc., 59-1 BCA ¶ 2095 at 8965 (1959), where the Board stated:
 
 
 75
 * * * Where, as here, the change is necessitated by defective specifications and drawings, the equitable adjustment to which a contractor is entitled must, if it is to be equitable, i.e., fair and just, include the costs which it incurred in attempting to perform in accordance with the defective specifications and drawings. Under these circumstances the equitable adjustment may not be limited to costs incurred subsequent to the issuance of the change orders. [Citations omitted.]
 
 
 76
 We hold that the plaintiff is entitled to an equitable adjustment which will compensate it for the costs which it incurred in trying to perform in accordance with the original specifications that turned out to be defective.
 
 
 77
 As indicated, plaintiffs request relief under alternative theories of recovery, i.e., full damages for breaches of contract on the part of defendant or, for judgment under the "Changes" clause of the contract for all increased costs and expenses incurred as a result of defendant furnishing defective and ambiguous specifications. It appears that plaintiffs' claims are redressable administratively and that they can obtain full relief by way of an equitable adjustment. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 404-405, n. 6, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). Therefore, in accordance with United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), the question of the amount to which plaintiffs are entitled to recover should be initially considered by the Armed Services Board of Contract Appeals, and plaintiffs are required to return to that Board for a determination as to the amount due them. (See note 2.)
 
 
 78
 Proceedings in the instant case are hereby suspended for a period not exceeding 6 months (following the date on which the court renders a final decision herein), to enable plaintiffs time to institute appropriate administrative proceedings, and to afford the Armed Services Board of Contract Appeals an opportunity to make a determination with respect to the amount to which plaintiffs are entitled. Plaintiffs shall, on or before the expiration of a 6-month period after the date the court's decision becomes final, submit a report to the court setting forth the results, or the then current status, of the further administrative proceedings before the Board.
 
 
 
 Notes:
 
 
 *
 The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 57(a). The facts are stated in the opinion
 
 
 [1]
 Neither the administrative record nor the submissions of the parties in this proceeding contains any reference to the other plaintiff herein, i.e., "Central Penn National Bank of Philadelphia (Penn) For the Benefit of Lloyd R. Maxwell and Caroline L. Maxwell," or explain the reason why Penn is a party plaintiff in this suit. On May 3, 1965, an order of the court was entered allowing a motion filed by defendant for issuance of a notice to a third party, i.e., Penn. to appear in this cause and assert any claim it might have in the subject matter of the suit. Notice was duly served on Penn, but, subsequent thereto, an order was entered on June 24, 1965, quashing the notice because, on May 26, 1965, a first amended petition was filed in which the above-named second plaintiff was included in this suit. Defendant admitted the allegation in paragraph XVIII of the amended petition that on March 4, 1959, Maxwell duly assigned to Penn all of its (Maxwell's) rights, title, and interest in and to all monies due from defendant under the contract here involved and that due notice of said assignment was given to defendant on March 13, 1959. Defendant denied another allegation in the same paragraph of the petition to the effect that on January 24, 1964, Penn, for a cash consideration, released, assigned, and transferred toLloyd R. Maxwell and Caroline L. Maxwell, Maxwell's sole stockholders at the time of the March 4, 1959 assignment to Penn, all of the latter's right, title and interest in and to said monies, and there is no proof of this fact in the record; however, no question has been raised as to Penn being a proper party plaintiff herein.
 
 
 [2]
 Plaintiffs' amended petition alleges, among other things, breaches of contract. During pretrial proceedings they requested a trial de novo on both the issues of liability and damages. At a pretrial conference held on September 16, 1965, the parties agreed that the administrative record did not contain sufficient evidence to enable the court to make a determination of the amount to which plaintiffs are entitled to recover, should the court decide the liability issue in their favor, and that the issues of liability and damages should be severed. Defendant declined to agree that if the plaintiffs prevailed on the issue of liability, they would be entitled to a trial de novo in this court on the issue of damages before first giving the ASBCA an opportunity to consider said issue and make a determination in regard thereto. The commissioner reserved ruling on this question until the court made a final decision on the issue of liability. For reasons set forth hereinafter, it is now clear that in the circumstances of this case, the ASBCA must be given an opportunity to make a determination (subject to appropriate review by the court) of the amount to which plaintiffs are entitled under this decision. After reviewing certain pretrial submissions of the parties and considering oral presentations made by them, the commissioner, during the aforesaid conference, ruled that the decision in Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965), was controlling with respect to the record on which the issue of liability in the instant case should be considered by the court, and that plaintiffs were not entitled to a de novo trial. Plaintiffs did not request review of this ruling and both parties agreed to the commissioner's suggestion that the issue of liability be presented to the court by way of assignment of errors
 
 
 [3]
 Defendant objects to plaintiffs' statement on the grounds that it consists of a "survey of the administrative record containing considerable argument, rather than being strictly a summary of the facts as found by the Board" (and set forth in its decision). In reply to defendant's stated objections, plaintiffs first point out that the commissioner's pretrial order of September 24, 1965, accorded plaintiffs the right to include in their brief, all "relevant facts which plaintiff [sic] considers are established by the administrative record in this cause." While plaintiffs' assertion is correct it should be explained that the commissioner did not rule that the court would find facts contrary to those found by the Board if its facts were based on disputed evidence of a substantial nature. Plaintiffs further reply that defendant "can point neither to factual error by plaintiffs, nor to any inconsistency between the relevantfacts found by the Board and those stated by plaintiffs"; that defendant's view of the record facts, both in its statement of "facts found by the Board in its decision" and elsewhere throughout defendant's argument, is fatally defective for a number of reasons, including, among other things, that defendant describes as "found" not only facts set forth in the Board's decision, but also legal conclusions therein, and that unfounded factual assertions permeate defendant's arguments.
 
 
 [4]
 A discussion supporting the limited authority of the court to decide and find facts based upon evidence in an administrative record, and the circumstances under which this can be done, together with citations to case law applicable to this subject matter, appear later on in this opinion. See that part of this opinion which cites Kraus v. United States, 366 F.2d 975, 980, 177 Ct.Cl. 108, 117-118 (1966), infra; also see Confederated Tribes of the Warm Springs Reservation v. United States, 177 Ct.Cl. 184, 207-208 (1966); Spokane Tribe of Indians, etc. v. United States, 163 Ct.Cl. 58, 70 (1963) and cases cited therein (mentioned in note 17)
 
 
 [5]
 While in their petition plaintiffs refer to this meeting as an "Industrial Conference," and both the defendant and the ASBCA use this term, plaintiffs assert in their assignment of errors that it was a "Coordination Conference," apparently because a verbatim transcript of the meeting is so entitled
 
 
 [6]
 The specifications themselves did not state in inches just what the diameters of the rollers had to be; however, the Board found that when read in their entirety, the specifications required that the dynamometer rollers were to be "in the neighborhood of 8½ inches." Although the rollers on the Clayton dynamometer were only 7 inches in diameter, 8½ inches is rather small for dynamometer rollers, their size being usually in excess of 12 inches
 
 
 [7]
 The speed of the revolving roller and its contact with the vehicle's tires creates a sharp deflection resulting in less area contact between the tire and the roller; this deflection is known as slippage. The smaller the diameter of the dynamometer rollers, the faster they must revolve in order to meet the larger wheels of the vehicle. As the speed of the rollers increases, the slippage between the vehicle's tires and the rollers also increases because of the greater deflection. As a consequence, although the engine is delivering at a certain power, that full power is not delivered to the dynamometer rollers — the rollers simply cannot absorb the full horsepower of the vehicle. An analogy can be drawn to an automobile having difficulty climbing an icy hill. Although the speedometer may read 60 miles per hour, the speed the rear wheels are spinning, the actual rate of road speed may only be a few miles per hour because of the slippage between the tires and the roadway
 
 
 [8]
 Whether you measure from the idler or the power roller is an important question as the facts of this case illustrate. Since the idler roller rotates freely on its axle, there can be no slippage. The power roller, on the other hand, is the roller which absorbs the power from the vehicle's wheels and therefore will suffer slippage. As a result, because of this difference in slippage, the idler roller will normally run at a greater speed than will the horsepower
 
 
 [9]
 While testifying at the hearing before ASBCA, Mr. Maxwell expressed the opinion that it is incorrect to measure speed from the idler roller because although such a measurement will determine how fast the wheels are going, it will not determine how much power is being used to propel the vehicle along the roadway — the very function a dynamometer is supposed to serve. The Government's expert witness, on the other hand, testified to the effect that there are also advantages to measuring speed from the idler roller, and that the question as to the roller from which speed properly should be measured gets into "a very controversial area" and that there is "argument on both sides of the issue."
 
 
 [10]
 The record does not contain the specifications for which the Clayton Dynamometer was manufactured. They could not have been prepared by the Rossford Ordnance Depot since that Depot had never prepared specifications for chassis dynamometers before it issued RFPD 175D
 
 
 [11]
 This letter discloses, among other things, that the method of engaging and disengaging the flywheel was not acceptable, that the dynamometer rolls were not smooth, that the present water system was not satisfactory, and that the method of locking the movable absorber units to the rails was unacceptable. Most significantly, while it was pointed out in the letter that the location of the tachometer generators — the device Maxwell attached to the power roller — was not acceptable since it was exposed to oil, grease and dirt in its present location between the rolls, no mention was made that the generator could or should have been attached to the idler roller rather than the power roller. It appears from the record that, aside from the inability of Maxwell to subject the sample dynamometer to the required endurance tests, Maxwell corrected the defects specified and that the Government later accepted the questioned items as modified by the requirements of the contract specifications relating thereto. In any event, resolution of the issue in dispute here does not turn on matters relating to any test other than the endurance test
 
 
 [12]
 Plaintiffs alleged and continue to contend that defendant orally suggested to Maxwell during the conference that, in view of its inability to locate a commercial vehicle capable of performing the specified 175 horsepower at 40 and 50 miles per hour endurance tests, equivalent tests might be performed by coupling a stationary engine capable of delivering 175 horsepower directly to the dynamometer absorber; however, defendant never admitted this allegation, the Board did not make a finding resolving the factual questions as to whether the Government suggested this possibility, and plaintiffs fail to cite any evidence in the record proving their version of this matter
 
 
 [13]
 The Board's decision with respect to this particular matter states that Maxwell's said request for waiver was denied on the date indicated "but with an indication that perhaps a substitute test using a stationary engine, might be approved by higher authority."
 
 
 [14]
 Although Maxwell suggested July 24, 1959, for the submission of the test report, Maxwell requested this date be changed to July 31, 1959. It appears that defendant acquiesced in such request
 
 
 [15]
 Plaintiffs alleged in paragraph XV of their petition that invoices for extra expense were submitted as stated in this quote and defendant admitted the allegations
 
 
 [16]
 There is no indication in the record that plaintiffs ever attempted to meet the endurance test requirements simply by measuring speed from the idler roller
 
 
 [17]
 This is the practice that has long been adopted in the federal courts with respect to administrative agencies. Confederated Tribes of the Warm Springs Reservation v. United States, supra; Spokane Tribes of Indians v. United States, supra, and cases cited therein. (See note 4.)
 
 
 [18]
 A new GMC Model 860 Tractor capable of producing at the engine 210 gross horsepower at 50 miles per hour was used for the tests run May 27-29, 1959; a White Motors Company Autocar tractor powered with a 275 horsepower diesel engine was used for tests on May 31, 1959; and an International Harvester Vehicle which, in the Government's words, was capable of producing 175 horsepower at 50 miles per hour for 1 hour, was used for the tests on September 30, 1959
 
 
 [19]
 Defendant quotes the Board as saying that "small rollers do not seem to cause too great a problem." This statement is taken out of context; what the Board actually said was that when speed is measured from the idler roller, small rollers do not create too great a problem