52 F.3d 343
 40 Cont.Cas.Fed. (CCH) P 76,765
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
CBI NA-CON, INC., Appellant,
v.
Togo B. WEST, Jr., Secretary Department of the Army, Appellee.
 No. 94-1393.
 United States Court of Appeals, Federal Circuit.
 March 28, 1995.
 
 Before MAYER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.
 BRYSON, Circuit Judge.
 
 
 1
 CBI Na-Con, Inc., (CBI) appeals the decision of the Armed Services Board of Contract Appeals denying CBI relief on its claim for additional costs incurred in completing a contract with the United States Army. We conclude that the Board did not correctly interpret the contract. We therefore reverse the Board's judgment and remand the case to the Board for further proceedings.
 
 
 2
 * Under its contract with the Army, CBI undertook to renovate a power plant in Radford, Virginia. The contract calls for CBI to replace four stationary steam turbine generators and associated equipment at the plant. The items principally at issue in this case are the "trip and throttle" (TNT) valves that are attached to each generator and the steam supply piping that carries steam to the trip and throttle valves, from which the steam then enters the turbine generators.
 
 
 3
 In the course of replacing the generators and other equipment, CBI found that in order to place each TNT valve as close as possible to each generator, it was necessary to use a "gooseneck" configuration for the steam supply piping. Using that configuration would have caused the piping to extend 27- 1/4 inches into the 68-inch walkways that ran alongside each generator.
 
 
 4
 Several drawings that CBI submitted to the Army during construction made reference to the gooseneck configuration. The Army's representatives approved the drawings, but the Army subsequently contended that it was only when its representatives visited the plant of CBI's subcontractor that they realized that the piping, when installed, would protrude into the walkways adjacent to the generators. The Army then advised CBI that its proposed installation was unacceptable. CBI responded that it would incur additional costs in reconfiguring the valve and piping installation and that it intended to file a claim for reimbursement of those costs. After making the changes the Army demanded, CBI filed a claim for $70,953. The contracting officer denied the claim, concluding that the original proposed configuration violated the contract and that the modification was therefore CBI's responsibility, not the Army's.
 
 
 5
 The Board of Contract Appeals denied CBI's appeal. The Board found that CBI's design drawings fell short of explicitly informing the Army about the extent of the incursion into the walkway. The Board further concluded that CBI's interpretation of the contract was not the only reasonable one, because permitting the steam supply piping to extend into the walkway "would have resulted in an installation that interfered with roughly 40 percent of the aisle." Because CBI did not establish that it relied on its interpretation at the time it bid on the contract, the Board held that CBI was not entitled to an equitable adjustment to compensate it for the costs associated with redesigning the steam supply assembly.
 
 II
 
 6
 The central question in this case is a legal issue of contract interpretation: whether the contract between CBI and the Army requires that the steam supply piping not protrude into walkways adjacent to the turbines. The Army contends that the contract imposes just such a requirement in Section 16A-4.2.3, which provides: "Space for installing the new equipment is limited to that made available by removal of the existing turbine generators." The Army regards the reference to "equipment" in Section 16A-4.2.3 to include the steam supply piping at issue in this case.
 
 
 7
 We do not agree. A fair reading of the contract compels the conclusion that the term "equipment" in Section 16A-4.2.3 refers to the steam turbine generator units and accessories that are the subjects of Section 16A, which is entitled "Stationary Steam Turbine Generators." That "equipment" does not include steam supply piping.
 
 Section 16A-4.4 provides:
 
 8
 Each steam turbine generator unit shall include the following:
 
 
 9
 a. Steam turbine with controls, accessories and integral piping and cabling pertinent to the steam turbine.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 d. Combined throttle and trip valve equipped with solenoid tip.
 
 
 13
 The term "integral piping" in Section 16A-4.4 refers to piping that is integral to (i.e., a part of) each turbine generator. "Integral piping" cannot be interpreted to include piping such as the steam supply piping at issue in this case, which is on the other side of the TNT valve from the generator and is not by any reasonable construction an integral part of the generator. This common sense interpretation of the contract terms is supported by the structure of the contract, for the steam supply piping is covered not by Section 16A of the contract, but by Section 15A, which is entitled "Piping Systems." That section of the contract specifically includes "steam supply, extraction and back pressure piping associated with the steam turbines." Section 15A-1.5.1 (emphasis added). Besides identifying the piping subject to Section 15A as "steam supply" piping, the description "associated with the steam turbines" is a far more apt description of the steam supply piping than the term "integral piping" that is used in Section 16A.
 
 
 14
 The government's answer to this point is not persuasive. It notes that after the reference in Section 15A-1.5.1 to "piping associated with the steam turbines," the contract states: "(refer Section: STATIONARY STEAM TURBINES)." The government reads that parenthetical reference to suggest that "piping associated with the steam turbines" was meant to be covered by Section 16A of the contract. That is not a reasonable inference from the contract language. In context, it is evident that the cross-reference to the section on stationary steam turbines was intended to apply only to the reference to "steam turbines," not to the associated piping. If the piping referred to in Section 15A-1.5.1 were meant to be included in Section 16A, as the government argues, it is hard to understand why Section 15A-1.5.1 would be included in Section 15A at all, rather than being placed in Section 16A.
 
 
 15
 The government also contends that before the Board of Contract Appeals CBI did not point to Section 15A as the portion of the contract applicable to the steam supply piping, and that CBI therefore should not be permitted to do so in this court. The legal issue before the Board of Contract Appeals and this court, however, is whether Section 16A of the contract prohibits the incursion into the walkways that would have been caused by CBI's proposed gooseneck configuration. Section 15A is not the basis of a separate argument that CBI raises for the first time in this court; rather, the reach of Section 15A simply sheds light on the proper construction of Section 16A. Because the entire contract is part of the record, this court may rely on Section 15A, along with other portions of the contract, in assessing the applicability of Section 16A to CBI's proposed configuration.
 
 
 16
 Unlike Section 16A, Section 15A contains no provision requiring the equipment covered by that Section to fit within the space vacated by the equipment being replaced. Instead, Section 15A requires only that "[a]ll work shall be installed so as to be accessible for operation, maintenance and repair." In addition, the contract contains a clause requiring the structures under construction to comply with standards promulgated by the Occupational Safety and Health Administration (OSHA). The Army does not suggest that the gooseneck configuration would have interfered with the access needed for operation, maintenance, and repair of any of the equipment at the plant. Moreover, the parties agree that, even if the gooseneck configuration had been employed, the walkways would have been of acceptable width under applicable OSHA standards. The clearance requirements of Section 15A and the OSHA clause were therefore fully satisfied by CBI's proposed configuration for the steam supply piping.
 
 
 17
 The correspondence between the parties is consistent with CBI's interpretation of the contract. In a transmittal dated September 19, 1990, the Army advised CBI that "[a]ll piping shall comply with OSHA clearance standards, including 6'8"' [headroom] clearance." Two months later, the Army wrote, "CBI is responsible for piping arrangements to ensure an installation which is not in conflict with existing or new systems and which will not block or conflict with passages." CBI responded by stating: "CBI will strive to avoid conflicts with existing and new systems and which will not block or conflict with passageways." CBI added that it was not aware of any places in the renovated plant where the newly installed equipment violated with the contract provision requiring conformity with OSHA standards.
 
 
 18
 The Army did not at that point object that compliance with OSHA standards for walkway clearances was insufficient to satisfy the contractual provisions applicable to the steam supply piping. Although we do not hold that the Army's conduct constituted an estoppel or consent to a change in the contract, we conclude that the Army's contemporaneous conduct is consistent with CBI's construction of the contract and thus provides further support for our conviction that CBI's construction is correct. See Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870 (Ct.Cl.1967).
 
 III
 
 19
 Because we interpret the contract not to require the steam supply piping to fit within the space made available by the removal of the existing steam turbine generators, we reverse the judgment of the Board of Contract Appeals. We remand the case to the Board to determine whether CBI is entitled to an equitable adjustment under the contract as we have interpreted it.