**G & H MACHINERY COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 218–84C.**

United States Claims Court.

March 31, 1989.

Mark A. Helfers, St. Louis, Mo., for plaintiff.

Joseph A. Kijewski, Washington, D.C., with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, for defendant. Paul J. Maxse, Gen. Services Admin., of counsel.

## OPINION

SMITH, Chief Judge.

This opinion is issued following trial and post-trial briefings. The dispute before the court arises out of a contract awarded by the General Services Administration to plaintiff, G & H Machinery Company, for the performance of certain repair services on various mechanical and electrical equipment. Plaintiff is seeking compensation beyond the amount set by the contract, based on a number of alleged breaches by the government. Based upon the court's findings set forth below, the court holds that plaintiff's contract claim must be denied.

## FACTS

On July 26, 1975, G & H Machinery Company (G & H) was awarded General Services Administration Contract No. GS–05W–56153. The contract was an indefinite quantity, time and material services contract.[1] It required G & H to perform repair services on various types of heavy construction and related equipment for a period of one year. Pursuant to the contract, G & H was entitled to receive in consideration for these services, a flat hourly labor rate of $9.12 multiplied by direct labor hours, plus payment for parts and materials. The hourly rate included all charges for direct labor, overhead and profit. The cost of parts and materials was based on current retail list prices less the discount offered in the contractor's bid. G & H's bid offered a 23% discount. Under the terms of the contract, the contractor was required to have an adequate inventory of parts to service items on which offers were submitted. The contractor was also required to maintain a satisfactory source of supply for such parts as needed in the performance of the contract. The General Services Administration (GSA)[2] was responsible for the administration of this contract on the government side even though the vast majority of items to be repaired came from the Air Force.

G & H fully performed under the contract, providing repair services with an estimated value of $2.4 million. Although the contract period ended on June 30, 1976, work under the contract was not in fact completed until December of 1977.

A follow-on contract was entered into between G & H and the government for the period from July 1, 1976, through June 30, 1977. The flat hourly rate for this contract was $13.68. G & H was compensated for the repair services it performed during the original contract period (July 26, 1975, through June 30, 1976) in accordance with the terms of the original contract. It was also compensated for work input prior to July 1, 1976, but performed during the period June 30, 1976, to December of 1977, in accordance with the terms of the original contract. That is, at the $9.12 hourly rate.

G & H contends that various breaches of the contract by the government[3] delayed its performance beyond the time period covered by the contract. It should be remembered that only the original contact is in dispute in this case. Asserting that the original contract had expired, G & H now seeks compensation for work done during this post-contract period under the terms negotiated pursuant to the follow-on contract. Applying the terms of the second contract, G & H claims that it is owed the additional amount of $355,851.26 for services provided during this period, plus interest, attorneys' fees and other litigation costs.

## DISCUSSION

### The Burden of Proof

The gravamen of plaintiff's claim is that its completion of the contract was unreasonably delayed by a series of breaches by the government. Unreasonable delays, attributable to the government, would constitute a breach of the implied obligation not to hinder the performance of G & H. *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26 (1977); *George A. Fuller Co. v. United States*, 108 Ct.Cl. 70,

---

1. "A time and material contract is a contract that a customer pays for whatever time it took at the labor rate times the amount of hours, plus parts...." Transcript of Proceedings at 146.

2. Specifically, the Property Rehabilitation Branch, Personal Property Division, Federal Supply Service of the GSA.

3. G & H includes among the alleged breaches that caused the delay, the government's (a) failure to provide applicable military technical orders; (b) failure to timely supply government furnished material and parts; (c) rearrangement of work priorities; (d) failure to timely supply information regarding the manufacture of unavailable parts and failure to assist G & H in a timely manner in obtaining certain parts; (e) input of items that were outside the scope of the contract; (f) input of a large number of items towards the end of the contract and outside the normal course of supply operations; (g) mailing of delivery orders after the expiration of the contract; (h) issuance of delivery orders that were inconsistent with the terms of the contract; (i) other miscellaneous breaches.

94, 69 F.Supp. 409, 411 (1947). This court has long held that in contract cases, where the plaintiff has alleged a breach of contract, the plaintiff must shoulder the burden of "establishing the fundamental facts of liability, causation and resultant injury." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965).

■ The burden of proof requires the plaintiff to establish three separate elements. First, it must establish the nature and extent of the government's breach of contract. Second, it must prove that it suffered damages. Any damages must be proved with sufficient certainty so that the determination of the amount of damage would not be pure speculation. *Willems Indus. v. United States,* 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied,* 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962). Finally, even where damages have been verified, plaintiff is required to demonstrate that there is a causal link between the damages and defendant's breach. *River Constr. Corp. v. United States,* 159 Ct.Cl. 254, 270 (1962); *Boyajian v. United States,* 191 Ct.Cl. 233, 239, 423 F.2d 1231, 1235 (1970).

The burden of proof stands as a threshold question. If the claimant fails to carry the burden of proof then, even in the absence of opposing evidence, he cannot recover on the breach of contract claim. In attempting to meet the burden, plaintiff has relied primarily on the oral testimony and notes of C.W. Krietemeyer, the president of G & H during the period in question. Citing the case of *Sanders v. United States Postal Serv.,* 801 F.2d 1328 (Fed.Cir. 1986), plaintiff suggests that its uncontradicted evidence establishes a prima facie case sufficient to shift the burden of going forward with evidence to the defendant. While *Sanders* states the rule that the burden of going forward with evidence is put upon defendant after a prima facie case has been made, the court notes that interested parties' evidence, even if unopposed, may not carry sufficient weight to establish the prima facie case necessary to shift the burden of going forward to defendant.

The test of sufficiency is whether the evidence rises to a level whereby the trier of fact could find for the plaintiff, based solely on the evidence presented. Here the court, unlike the trier of fact in *Sanders,* for the reasons to be discussed, does not give sufficient weight to the plaintiff's evidence to establish a prima facie case.

In applying this test and weighing the sufficiency of the evidence presented, the court must be on guard against testimony based on conjecture, speculation or unwarranted assumptions. *Snowbank Enter. v. United States,* 6 Cl.Ct. 476, 486 (1984). The weight and sufficiency of this evidence hinges on the credibility of the witnesses and the support for their testimony found in the record.

■ The court notes here that the plaintiff's motion to exclude evidence of fraud was denied. Plaintiff's argument that the evidence of fraud constituted an affirmative defense that was not plead misses the point of defendant's evidence of fraud. An affirmative defense assumes that plaintiff will present a prima facie case which defendant may then defeat by alleging and proving additional evidence of one of several types of actions by plaintiff that the law has decided may cause the forfeiture of an otherwise valid claim. Such is the case when the affirmative defense of fraud is alleged. In the usual situation plaintiff proves a facially valid contract, its breach and damages but defendant proves a fraud in the inducement or execution of the contract which defeats the claim.

Here plaintiff is attempting to recover on the valid follow-on contract with the United States by proving various breaches of the original contract by the United States. The United States put on evidence of fraud, not as an affirmative defense, but a method of attacking the credibility of plaintiff's testimonial and documentary evidence of breach. In other words, defendant attacks, through evidence of fraudulent accounting, the very existence of a prima facie case. It does not defend itself with allegations of fraud once a prima facie case has been presented. *See* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1270

(1969). The defendant is attacking the credibility of the documentary evidence plaintiff relied upon to prove its case. It is established that documentary evidence such as plaintiff's books of account can be attacked "by . . . calling witnesses to prove that these entries are false and fraudulent." *First National Bank v. Schroder*, 175 Minn. 341, 345, 221 N.W. 62, 64 (1928). 5 J. Wigmore, Evidence in Trials at Common Law § 1557 (1974).

### The Alleged Fraud

The alleged fraud by G & H consisted of the creation of inaccurate records. Testimony by two former employees of G & H, Connie Lee Ann Julius and Marlyn Marie Henson, indicated that they were directed by their supervisor, Ruth Wood, to misprice the invoices to the government. They would do this by posting the maximum allowable labor hours and parts, under the job estimate to the invoice, whether or not these hours or parts were related to the particular job. Excess labor hours and parts would thus be posted randomly to jobs where the estimates (the estimate was the dollar amount for each repair job which could not be exceeded by G & H) had not yet been reached. The following exchange illustrates the procedure:

BY MR. KIJEWSKI: When you would receive the time card with a job number on it, what would you do with that time card?

A: I would post it to the mechanic's time sheet with that number on it.

Q: What would happen if when you went to post those hours to the mechanic's time sheet with the same number on it, you saw the total of the hours already posted on that sheet exceeded or was coming close to the estimate which you referred to before?

A: I was instructed to erase that number and put another number on it.

Q: Which number are you referring to?

A: The one that has its sheet already filled up.

Q: Are you referring to the number on the sheet or the number of the time card?

A: If the hours were completed on the mechanic's time sheet, then I would erase the one on the time card and put another job number on it.

Q: Why would you put another job number on it?

A: Because that mechanic's time sheet for that job was already filled up. The hours were already used.

Q: Where would you get the second number to put on the time card after erasing the first one?

A: Sometimes I would just scatter them on different ones and—

Q: By different ones, what are you referring to?

A: Different mechanic's time sheets.

Q: For different jobs?

A: Yes. Other times I was given certain numbers by the office manager.

Q: Who was the office manager?

A: Ruth Wood.

THE COURT: Let me get a point clear. When you weren't given a specific set of numbers to fill up by Ruth Wood, how would you pick?

WITNESS: Just pick and choose, it didn't matter.

THE COURT: How many mechanic's sheets would you have at a given time?

WITNESS: Several, many.

THE COURT: Those represented each one's work being done at some stage and you would just take 8 hours and how would you split the 8 hours up?

WITNESS: Usually just a full 8 hours.

THE COURT: And stick it where it fit.

WITNESS: Right.

THE COURT: Would you split it up ever?

WITNESS: Sometimes.

THE COURT: What would be the smallest you would split it?

WITNESS: 4.

THE COURT: You would never split an hour each?

WITNESS: No.

THE COURT: Okay, thank you.

BY MR. KIJEWSKI: Was it a regular practice at G & H Machinery Company to alter the time cards and bill them to

mechanic's time sheets the way you just described?

Q: I would do that sometimes, I wouldn't do it on every time card, no.

Q: On time cards when you did not do that, why did you not do it?

A: Because the mechanic's sheet was not filled up. I would just post the card to the right sheet.

Q: Would it be fair to say that that was a regular practice at times when mechanic's sheets for a job were filled up and time cards with additional hours for that job were still coming in?

A: Yes.

Q: Did you ever post parts?

A: Sometimes.

Q: Were parts posted in a similar way?

A: Yes.[4]

The following example from the testimony of Harvey G. Florian, a regional GSA Inspector General, is illustrative of the results of such an accounting, or anti-accounting system:

THE COURT: Did you find any indication of the parts record of parts being included that were clearly not relevant to a particular job?

WITNESS: Yes, sir.

THE COURT: Like windshields for a bomb lift.

WITNESS: I can give you a specific example where the item was the size of a attache case, it was a flight line director test set used to check flight line directors on jets and I did find a Ford engine block assembly listed to that particular invoice posted to that particular parts sheet. Knowing the size and dimensions of this particular item, I knew a Ford engine block could not be reasonably charged to that particular job.[5]

▮ Mr. Florian used the following analogy to explain how this system was fraudulent:

[Suppose] you [take] your automobile to a gas station to be repaired. When you take it in there you ask the mechanic for

an estimate. The mechanic estimates that it is going to be $100 in labor and $50 in parts, but he merely makes a minor adjustment on that car and bills you the $100 in labor and the $50 for parts anyway.[6]

The plaintiff's contention that there was no fraud because there were no labor hours made up does not wash. The problem with that particular contention is that it fails to recognize the effect of the fraudulent accounting system on the total contract. Plaintiff was billing for actual hours, but these hours were not allowed to be billed under the contract. Under a time and material contract the contractor accepts the risk of exceeding the agreed estimate. This the contractor did, and then fraudulently tried to evade.

Thus, the evidence presented by G & H fails to present a prima facie case. Even though the court finds this to be so, the court proceeds to review each specific allegation of breach upon its own merits but in light of the lack of truly credible evidence. As for the individual claims set forth below, the court concludes that even if the plaintiff's evidence was not tainted by the evidence of fraud other reasons require a finding in defendant's favor.

### The Specific Alleged Breaches

I. The Government's Alleged Failure to Provide Applicable Military Technical Orders

Plaintiff's first claim is that the government failed to timely supply it with required military technical orders. Military technical orders detail repair requirements with regard to materials, labor, tolerance levels of replacement parts, delivery dates and inspections. Under the contract, G & H was required to comply with the requirements of military technical orders "when applicable." The input letters from the military services, containing the individual work order, indicated whether a military

4. Transcript of Proceedings at 569–71.

5. Transcript of Proceedings at 594.

6. Transcript of Proceedings at 598–99.

technical order, or a drawing number [7], existed for the particular item involved.

Shortly after the start of the contract, G & H apparently had difficulty acquiring military technical orders. G & H contacted Kelly Air Force Base, which was actually inputting the equipment to be repaired by G & H, in addition to orally complaining to the GSA about the difficulty in obtaining the military technical orders. Eventually, either all the military technical orders were provided, or G & H developed its own standards which were approved by Kelly Air Force Base personnel.

The government argues that the contract was under the sole administration of the GSA, and that G & H was required to seek assistance from that agency. Although there is considerable merit to this argument, the record indicates that despite the GSA's role as contract administrator, officials at individual Air Force bases played a substantial role in the actual repair process. These officials input equipment, provided technical guidance, and received and inspected equipment after it was repaired. Repair specifications were provided directly from the Air Force bases and the GSA did not handle them.

The court, however, does not need to reach a decision on whether G & H was correct in contacting the individual Air Force bases for help, or was justified in relying on the representations of officials at Kelly Air Force Base. Even assuming, *arguendo*, that G & H correctly sought help from the individual bases, plaintiff has not established the necessary causal link between the alleged failure to provide the technical orders, and the subsequent late completion of its performance.

█ G & H offered evidence of certain government failures with regard to the technical orders, but failed to establish a connection between these failures and the delay in the completion of its performance. The evidence that was offered to support these inferences consisted primarily of conclusory statements made by C.W. Krietemeyer. The statements were largely unsup-

ported by evidence with any independent guarantee of reliability. On a number of points, C.W. Krietemeyer admitted that his evidence was inaccurate. The court is left with naked allegations made by plaintiff's main witness that lack the documentary and testimonial backing necessary to support recovery. *See Wunderlich Contracting Co.*, 173 Ct.Cl. at 199, 351 F.2d 956.

The failure to establish the causal link is of particular importance in the face of a number of facts that militate against plaintiff's contention. These include the fact that only one-half of the input letters required G & H to acquire technical orders, and that approximately one-half of the repairs performed were later repeated under the same contract. In addition, G & H admitted that by the end of the contract all the requisite technical orders had been provided.

## II. The Government's Failure to Timely Supply Materials and Parts

Plaintiff next contends that the government delayed its performance under the contract by failing to timely furnish necessary materials and parts. The contract makes it clear that the primary responsibility for acquiring parts and materials resides with the contractor. The terms of the contract require the contractor to have an adequate inventory of parts for repair services he offers to perform, and a satisfactory source of supply for parts that may be needed for performance under the contract. The contract does, however, provide that:

> The Government reserves the right to furnish, without cost to the contractor, any repair parts, accessories or supplies from Government supply sources.

G & H alleges that the government indicated, in a number of discussions with C.W. Krietemeyer, that it would exercise its option to supply certain parts and materials. It alleges that subsequent delays, and even failures, on the part of the government in supplying the parts and materials, delayed G & H's performance.

The government argues that G & H has not offered proof that it actually suffered

7. A drawing is similar to a blueprint and contains equipment specifications.

delays from the alleged lack of parts. It also contends that G & H has failed to provide any proof that the government agreed to exercise its option to supply parts and then failed to follow through.

Although it is apparent from the testimony that G & H encountered certain difficulties in securing necessary parts and materials, it is not at all clear that these difficulties give rise to a compensable claim. The responsibility under the contract to secure the required parts and materials lies first and foremost with the contractor. On a number of occasions the government supplied materials and parts, or facilitated their delivery from private manufacturers. It is conceivable that the government offered to provide certain parts or materials and then failed to deliver, causing certain delays in G & H's performance. Plaintiff, however, presented no convincing evidence of such a failure.

The evidence presented included the testimony and notes of C.W. Krietemeyer, and records prepared by G & H concerning the receipt of parts. Both the testimony and the notes suffer from admitted inconsistencies. The credibility of this evidence is further called into question by evidence indicating that the records were altered as part of the broad pattern of fraud perpetrated by G & H. Although additional evidence concerning parts and materials was apparently destroyed without fault, this in no way lessens the burden of proof plaintiff is required to bear. G & H's evidence on the question of delays in the delivery of parts and materials does not rise to the level necessary to overcome this burden. Without this evidence, the court has no basis on which to judge the extent of the alleged delay and the damages, if any, that might arise.

8. It appears from the testimony that minor delays in the delivery of parts and materials are a routine part of many repair contracts.

9. The relevant provision reads:
*Urgent Requirements:* These are individual bona fide delivery requirements of ordering activities for supplies or services which call for DELIVERY TIMES WHICH ARE SHORTER THAN THE DELIVERY TIMES SPECI-

Even assuming that there were problems with the delivery of government furnished parts,[8] it is incumbent on plaintiff to tie its costs to fault on the defendant's part. *See River Constr. Corp.,* 159 Ct.Cl. at 270. It is essential to G & H's claim for it to establish that any delay in the delivery of the parts, delayed the completion of its performance under the contract. G & H did not, however, establish this link. It failed to present evidence establishing the length of the delays or even that these delays were responsible for the late completion of the work. In cases where contracts have taken longer to complete than anticipated, this court has made it clear that plain allegations of delay are not alone sufficient for recovery. *Neal & Company, Inc. v. United States,* 13 Cl.Ct. 282, 287 (1987); *Wunderlich Contracting Co.,* 173 Ct.Cl. at 199, 351 F.2d 956.

### III. The Government's Reprioritization of Repair Work

Plaintiff's third claim is that the reprioritization of certain repair work by the government, substantially delayed performance under the contract. G & H generally completed the work input to it on a "first-in, first-out" basis. But according to the plaintiff, officials from Kelly Air Force Base occasionally demanded that repairs on specific pieces of equipment be completed on an expedited basis. The reprioritization of work, after this work had been input, and in some cases after repairs had been started, allegedly disrupted G & H's production efforts. These disruptions, plaintiff contends, delayed the completion of a substantial number of repair jobs.

By its terms, the contract permitted the government to request that the contractor perform specific repairs on an expedited basis.[9] According to these terms, the con-

FIED IN THE RESPECTIVE CONTRACTS. When the CONTRACT delivery time is longer than the urgent delivery requirements and the ordering activity determines that time permits, the Contractor shall be requested by letter, telegram, or telephone (confirmed in writing) to state the best delivery time which he can meet. The Contractor shall reply to the inquiry within not more than 3 working days after receipt and by the same or faster

tractor could be requested to state the best delivery time it could meet, and then the requesting agency could place or withhold the order. If the order was placed, the terms and conditions of the original contract applied to the contractor and the government. If the order was not placed then the contractor was free from obligations with regard to that order.

■ The contract provided that a request for expedited delivery could be written or oral, but required that an oral request be followed up with a confirming letter. Plaintiff alleged that the demands from Kelly Air Force Base were made orally. No evidence was presented, however, indicating whether a confirming letter existed. The reason for this appears to be that G & H expedited the completion of certain repairs as favors to Kelly Air Force Base personnel.[10] Testimony by C.W. Krietemeyer indicated that G & H voluntarily undertook the reprioritization that it alleges delayed completion of the contract.

Although not dispositive, when considered in light of the paucity of supporting evidence, it suggests that the fault for any delays in G & H's performance lies solely with G & H. At the very least, the court is

without a basis to judge the extent and costs of the alleged reprioritization.

Plaintiff has also failed to link the reprioritizations with the late completion of its performance under the contract. In its complaint, plaintiff alleges that the effort to "crate up and move" the large pieces of equipment disrupted the work flow. But it has not demonstrated how these disruptions delayed its performance beyond the contract period. The court is left with allegations of various disruptions, and repair work completed after the end of the contract period. Plaintiff has provided no basis, however, to link the two.

■ Finally, assuming *arguendo* that government reprioritizations delayed plaintiff's performance, it is not apparent that the government breached the contract. The contract made it clear that the contractor had the option to accept or reject requests for reprioritization. G & H accepted the requests from Kelly Air Force Base. Once the contractor offered to perform within a certain time frame, and the government accepted, both parties were bound by the original contract, including the provisions on compensation. By accepting the requested reprioritization, G &

communications media than the one by which he received the inquiry. If the accelerated delivery time is acceptable to the ordering activity, any resultant orders shall be delivered within this shorter delivery time in accordance with all other terms and conditions of the contract.

10. The government makes the additional argument that the reprioritization requests were input to G & H, by officials from the individual bases who lacked the authority to make such requests. It points out that by the terms of the contract, the GSA was the sole administrator of the contract. Delays which arose from the alleged reprioritization, it asserts, would be noncompensable because they were not ordered by authorized individuals.

There is strong support for the contention that the United States cannot be bound by unauthorized agents, and that only officials with contracting authority can bind the United States to a contract. *See Suwanee River Finance, Inc. v. United States,* 7 Cl.Ct. 556, 559–560 (1985). It is also clear that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins.*

*Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

These accepted principles do not settle the question, however, of whether the officials at Kelly Air Force Base had the *authority* under the contract to reprioritize the repair schedule. Testimony indicates that these officials were responsible for decisions regarding which equipment was input, the acceptable cost of repairs, whether parts would be provided, technical repair questions, and issues relating to the handling of the equipment. Although the contract is clear that the GSA was the sole administrator of the contract, it is not immediately clear whether this responsibility extended to repair and handling questions. The course of dealing indicates, however, that the individual Air Force bases were endowed with considerable authority regarding technical repair issues. Having endowed the bases with this authority, the government cannot now claim that the GSA had exclusive administrative authority. It would appear that the authority to make arrangements concerning repair priorities was in fact ceded to the individual bases. *See Fox Valley Eng'g, Inc. v. United States,* 151 Ct.Cl. 228 (1960); *Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 624–25, 427 F.2d 1233, 1243 (1970).

H accepted responsibility for any delays that flowed from that acceptance.

IV. The Government's Failure to Provide Information Necessary for the Manufacture of Parts and to Assist in Obtaining Parts

Plaintiff next alleges that the government failed to assist G & H in obtaining or manufacturing necessary parts. When G & H was unable to get parts from government supply sources, it was forced to order them from alternative sources or manufacture the parts itself. Ordering the parts from alternative sources apparently required the payment of a set-up fee of approximately $750.00. Plaintiff complains that the government unreasonably delayed its performance by refusing to pay these set-up fees. Plaintiff also contends that when it undertook to manufacture the parts itself, the government delayed its operations by failing to provide necessary technical orders.

█ With regard to plaintiff's contention that the government did not assist G & H in obtaining parts, the court refers to the earlier discussion in Section II on parts and materials. The contract is clear that the primary responsibility for acquiring parts rests with the contractor. It requires that the contractor have an adequate inventory of parts for repairs he offers to perform, and a satisfactory source of supply for parts that may be needed for adequate performance under the contract. There is no evidence that the government assumed the affirmative responsibility to obtain parts for G & H. And although there was

testimony that on a number of occasions the government interceded to facilitate delivery from manufacturers, there is no evidence that government action taken on behalf of G & H, delayed G & H's performance.[11]

Plaintiff's argument concerning the failure to timely supply necessary technical orders fails for the reasons set forth in the court's discussion in Section I of these technical orders. Although plaintiff alleges that the government failed to provide necessary technical orders, it has not supported this allegation with convincing evidence. The evidence that was introduced consisted primarily of conclusory statements and post-hoc records made by C.W. Krietemeyer. Krietemeyer admitted during testimony that some of this evidence was inaccurate. And evidence of a consistent pattern of fraud in G & H's recordkeeping further weakens the credibility of plaintiff's evidence. The court has here also been left with allegations unsupported by sufficient documentary or testimonial evidence.

V. The Government's Inputting of Items that were Outside the Scope of the Contract

The contract set forth the specific types of equipment that G & H would service and the regions that this equipment might be sent from.[12] Plaintiff alleges here that the government input equipment for repair that had not been included under the terms of the contract. Specifically it alleges that the government input certain ground support equipment known as "yellow-iron",[13]

11. Plaintiff contends that the government's failure to pay the "extremely insignificant" set-up fee delayed its performance. It is clear, however, that the government was under no obligation to do so. Instead it was the contractor's responsibility to ensure the availability of necessary parts.

12. G & H agreed to accept work from two service areas: Rock Island, Illinois and Salem, Illinois. It agreed to service on and off road heavy construction and related equipment; material handling equipment; gasoline and diesel engines, fuel injection equipment and related items; stationary and portable non-vehicular equipment and related items; trucks and truck

tractor, and certain specialized trucks; aircraft/aerospace servicing equipment and related items. It agreed to service over 186 separate makes of equipment. G & H specifically included "munitions handling equipment" on the "Make of Equipment Schedule." "Aircraft/Aerospace Service Equipment and Related Items" was also listed on the "Bid Schedule."

13. "Yellow-iron" apparently refers to the various types of air ground equipment. On direct examination, Mr. Krietemeyer identified yellow-iron as non-motorized equipment "such as jack stands and work benches and cradles, adaptors, items such as that." On cross examination Mr. Krietemeyer testified that yellow-iron was part

which it had not agreed to repair. When G & H questioned the contract administrator about refusing to accept the equipment, plaintiff contends, it was told that the equipment would be input to another repair shop and that G & H would be liable for transportation costs and any difference in hourly rates. The repairs performed on this equipment, plaintiff contends, delayed its overall performance under the contract.

The government responds that all equipment input to G & H was within the scope of the contract. In support of this, it points to G & H's agreement under the contract to service "Munitions Handling Equipment" and "Aircraft/Aerospace Servicing Equipment and Related Items." It asserts that the so-called "yellow iron" equipment would be included under these general categories and that there had been no showing that equipment had been input that was outside the scope of these terms and the contract. Allowing that there could be some ambiguity in these terms, however, the government asserts that plaintiff's acceptance of the equipment over the life of the contract indicates that plaintiff considered repair of the equipment to be within the scope of the contract. The course of dealing, the government asserts, reflected the parties' understanding of the terms of the contract and should be given controlling weight in interpreting these terms. *See Maxwell Dynamometer Co. v. United States*, 181 Ct.Cl. 607, 630, 386 F.2d 855, 870 (1967).

The government dismisses plaintiff's charge that it had been threatened with certain costs if it refused to accept the equipment, asserting that there was no proof of such threats. Even if the contract administrator had made such threats, it continues, such acts would have been beyond the contract authority of that official. The government cannot be held responsible, it concludes, for representations made by an official acting outside the scope of his authority.

As an initial matter, plaintiff failed to establish that the government input equipment that was outside the scope of the contract. C.W. Krietemeyer admitted that the so-called "yellow iron" equipment, and other equipment which G & H had alleged were outside the scope of the contract, would in fact come under the list of items that G & H had agreed to repair. This testimony showed that certain equipment was listed as outside the scope of the contract based solely on when they were input, and not on the type of equipment involved, as alleged in its complaint.[14]

■ This is of particular importance in light of the actions of the parties during the course of the contract. The contract covered repairs of both "Munitions Handling" and "Aircraft/Aerospace Servicing" equipment. It appears from the course of conduct, that both parties considered the input and repair of "yellow-iron" equipment to be included under these classifications. This was indicated by the fact that this equipment was input during the entire term of the contract without meaningful opposition or complaint from the plaintiff. Even assuming that the parties had not originally intended to include this equipment within the scope of these classifications, the parties were free to modify the existing obligations, in this case to expand the scope of the classifications, and the court may imply a modification from their conduct. *Montana Power Co. v. United States*, 8 Cl.Ct. 730, 736 (1985). *Ladum v. United States*, 5 Cl.Ct. 219, 223 (1984).

Plaintiff has discounted the importance of the parties' conduct, asserting that G & H was compelled to accept the equipment by the threat of economic sanctions. No objective evidence was introduced by plaintiff, however, demonstrating that the contract administrator made these threats.

---

of the air ground equipment. He also admitted that yellow-iron, if it was servicing equipment, would be within the contract terms as aircraft/aerospace servicing equipment and related items. Repairs to yellow-iron usually required only scraping, sanding, painting and other repairs generally done by semi-skilled workers.

**14.** The question of whether certain equipment was outside the scope of the contract by virtue of when it was input is discussed in Section VI.

Although the court recognizes the problems inherent in producing this evidence, it notes that plaintiff did not question the contract administrator about these allegations. Presumably, if threats of economic sanctions had been made, examination of the contract administrator on the topic would have been in order. The lack of examination on such an important topic undercuts plaintiff's argument that threats were made. This is of particular importance in view of testimony indicating that normal operating procedure called on the contract administrator to inform contractors of the possible consequences of defaulting on the contract. These consequences consist of liability for additional costs incurred by the government. Plaintiff does not allege that the contract administrator went beyond the terms of the contract in enumerating the potential consequences of a default by G & H. There has been no showing that the government's statements reached the level of threat or duress.

Finally, plaintiff failed to demonstrate how the input of the "yellow-iron" equipment, whether within the scope of the contract or not, delayed plaintiff's performance beyond the contract period. There is no allegation, for example, that this equipment took longer to repair, involved extra manpower, or overburdened G & H's capacities. In absence of additional evidence, the court is left without a discernible causal connection between the type of equipment input, and subsequent delays in performance.

VI. The Government Input Large Amounts of Equipment at the End of the Contract and not in the Normal Course of the Contract

Plaintiff's sixth allegation is that the government input an increasingly large vol-ume of work at the end of the contract period. Over the final four months of the contract, it estimates that 70% of the total repair work was input. This overloading, plaintiff continues, was part of a concerted effort on the part of the government to unfairly take advantage of the contract rate.

Equipment was not input in the normal course of supply operations, it alleges, and therefore was not properly input under the terms of the contract.[15] Plaintiff claims that this constituted a breach of the contract and delayed G & H's performance.

The government does not dispute that a high percentage of the work under the contract was input in the final four months of the contract. It argues, however, that this was not a breach of the contract. There was no requirement, it asserts, that work had to be input on a regularly scheduled flow. Instead, work could be input, under the terms of the contract, as the need arose. Even if a large part of the repair work was input toward the end of the contract, it concludes, this was not a compensable breach of the contract, but was in fact consistent with the terms of the contract. Finally, the government points out that G & H was entitled to reject the work input at the end of the contract as beyond its capacity and as involving equipment from outside its service area, but voluntarily chose to accept this equipment.

The contract specifically incorporated by reference the provisions contained in the GSA Supplemental Provisions. By the terms of Paragraph 43, the contract covered work that was input during the contract period, even if it wasn't delivered during that period. The expressed purpose of this was to promote the "continuity of supply"

---

15. Plaintiff refers here to the provision contained in the GSA Supplemental Provisions, GSA Form 1424, paragraph 43 (page 5) entitled "Deliveries Beyond the Contractual Period—Placing of Orders" which reads:

In accordance with the Scope of the Contract clause, this contract covers all requirements that may be ordered, as distinguished from delivered, during the contract term. This is for the purpose of providing continuity of supply by permitting ordering activities to place orders as requirements arise in the *normal course of supply operations.* Accordingly any order mailed (or received, if forwarded by other means than through the mail), to the Contractor on or before the expiration date of the contract and providing for delivery within the number of days specified in the contract, shall constitute a valid order. (Emphasis added).

of necessary operations. The government was limited with regard to this provision, however, to placing orders as requirements arose in the ordinary course of operations.

■ The parties agree that the government was not required to input equipment for repair on a regularly scheduled basis. Instead, it was permitted to order repairs on an as-needed basis. It appears, however, that the government input equipment at the end of the contract to exploit an advantageous contract and not according to its repair requirements. The fact that the delivery schedule was heavily weighted at the end of the contract tends to support this. It was also supported by testimony that Kelly Air Force Base pushed to input equipment prior to the expiration of the contract because there was some question as to the availability of repair services for the following year. The GSA Property Utilization Specialist, Robert J. Wagner, indicated during his testimony that he was aware of a push to input equipment before the contract expired for this reason. This suggests that the equipment was input outside the normal course of operations.

The government has argued that G & H was entitled to reject the equipment in question as beyond its capacity and as involving equipment input from outside its area. The voluntary acceptance of this equipment, it argues, would indicate that G & H considered the input of this equipment to be within the scope of the contract. This argument depends on the availability of the right of rejection for these reasons. With regard to the right of rejection for equipment outside the service area, however, the contract indicates that the con-

tractor could reject requests only for *on-site* service at locations outside the service area. The items in question were transported to G & H's facilities, in which case, unless it was permitted to reject the equipment for other reasons, G & H was required to repair the input equipment.[16] With regard to the right to reject based on capacity, the contract indicates in an informational section of the contract that the government was permitted to regulate the flow of equipment into a contractor's shop, based on that contractor's location, technical capability, and work capacity.[17] The contractor's right to unilaterally reject equipment based on capacity is at best ambiguous. There was no showing by the government that plaintiff knew or should have known that it was free to so reject the equipment in question. Without such a showing, the government cannot establish that G & H waived its objection.

The court rejects, however, plaintiff's claim based on the input of this equipment. Plaintiff contends that the input of this equipment was outside the ordinary course of the government's operations, and therefore outside the scope of the contract. Prior to the end of the contract, though, plaintiff accepted the input of government work orders, and after the contract period had expired, plaintiff fully performed. Payment was made in accordance with the terms of the original contract and without protest by plaintiff. The full performance by both parties and lack of any formal protest by G & H, indicates to the court that the parties did not consider the input of this equipment to be outside the ordinary course of operations. The ongoing construction of the contract by the parties

---

**16.** The relevant provisions read:

Use of contracts resulting from this Solicitation for Offers is not mandatory for services required at a location outside a designated service area. However, the agencies located outside of a service area, upon which no other contract is binding, may use any contract (if advantageous to do so, price and other factors considered) by transporting the items to be serviced to and from the contractor's repair facility, in which event the contractor shall be *required* to service such items subject to the terms and conditions of the contract, notwithstanding the provisions of c, below, or request

service at a government location. (See Delivery Prices, page 9, paragraph 5). Such services may be ordered by the government subject to acceptance by the contractor. Failure on the part of the contractor to reject the request for *on-site* service at the time it is made shall constitute acceptance, whereupon all other provisions of the contract shall apply to such order. (Emphasis added).

**17.** The relevant provision reads, "Equipment input by [the] Department of Defense to a contractor's shop shall be contingent upon location and technical capability and capacity."

should be given great weight. *Maxwell,* 181 Ct.Cl. at 630, 386 F.2d at 870. But, since the only evidence that the contractor objected is evidence that G & H complained about the large amount of input at the end of the contract, the court is not convinced that at the time of contract performance there was not an intent to perform by G & H. If this was the case, then the government's actions were consistent with the terms of the contract.

In the alternative, if G & H considered the input of this equipment to be outside the ordinary course, its continued performance created an implied-in-fact contract[18] to service the equipment at the quoted rate. In this case, payment made by the government at the quoted rate was in full satisfaction of plaintiff's due under the terms of that contract. Critical to the court's finding that an implied-in-fact contract existed, is the failure of the plaintiff to register a formal complaint at the time the equipment in question was input or at the time of payment.

The importance of a formal complaint was underscored in *Dynamics Corp. of America v. United States,* 182 Ct.Cl. 62, 389 F.2d 424 (1968). The court in that case rejected the argument that the plaintiff's performance and acceptance of the contract price, constituted a waiver of its right to obtain more than the contract price. The court rested its decision on the fact that the plaintiff had registered a timely protest with the government and had indicated its intention to file a claim in accordance with the contract's disputes clause.[19] This puts the government on notice that plaintiffs continued performance could involve additional costs to the government. This court's predecessor has required effective notice for the purpose of protecting the government from incurring unnecessary costs. *See J.A. Ross & Co. v. United States,* 126 Ct.Cl. 323, 329–30, 115 F.Supp. 187, 190, (1953). *See also Fox Valley Eng'g, Inc. v. United States,* 151 Ct.Cl. 228, 237 (1960) ("A formal protest against performing work not required by the contract is of particular importance in instances in which orders are given by subordinates, without the knowledge or authorization of the contracting officer. A protest to the contracting officer thus serves as a protection to the Government against additional contract costs unless authorized by duly empowered officials.")

Although G & H introduced evidence, through the testimony of Robert Wagner, that it had informally complained to Mr. Wagner, this falls short of the formal notice that is required.[20] In situations where the contractor believes that work required by the government is potentially outside the scope of the contract, it is incumbent on the contractor to formally file a "timely protest ... by indicating its intention to file a claim in accordance with the disputes clause of the contract[ ]" *Dynamics,* 182 Ct.Cl. at 78, 389 F.2d at 433, at least in situations where the contract contains a disputes clause mandating continued per-

---

**18.** An implied-in-fact contract requires a meeting of the minds of the parties. This can be inferred from the conduct of the parties, in light of the surrounding circumstances, to show a tacit understanding or agreement. *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923).

**19.** The court stressed that the plaintiff "did all that could reasonably be expected of it under the circumstances by making the timely protest and by indicating its intention to file a claim in accordance with the disputes clause of the contract. This served to put the government on notice that, if it were ultimately held to have demanded goods not required under the contract, it might be required to pay the reasonable value thereof. *Dynamics,* 182 Ct.Cl. at 77–78, 389 F.2d at 432–33.

**20.** The requirement of formal notice is more than mere formalism. Although the evidence showed that plaintiff had complained, there is no indication that the plaintiff believed or seriously contended that the input was beyond the scope of the contract. There is little to suggest that G & H preferred to reject the work being input or that G & H indicated to the government that it intended to seek damages for providing work outside the scope of the contract. This is particularly true in light of the fraudulent scheme involved here. It appears that the scheme needed further repair orders upon which to feed, much like a forest fire needs ever increasing acreage if it is not to be contained and extinguished.

formance [21], such as the one contained in this contract. *See Willard, Sutherland & Co. v. United States,* 56 Ct.Cl. 413 (1921) *aff'd* 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923).

### VII. The Government Mailed Certain Work Orders After the Expiration of the Contract

Plaintiff contends that the work orders dated June 29 and June 30, 1976, were not mailed before the expiration of the contract. As evidence of this it points to the testimony of C.W. Krietemeyer indicating that these orders were received at least seven days after June 30, 1976. Plaintiff also points to the apparent uncertainty of Mr. Wagner, the Property Utilization Specialist involved with this contract, concerning the date the letters were sent to support this assertion. Referring to the GSA Supplemental Provisions, incorporated by reference into the contract, plaintiff contends that the orders mailed after the expiration of the contract period were invalid. The input of these orders it claims was in breach of the contract and delayed its performance under the contract.

Plaintiff's claim on this point fails, however, for lack of any credible evidence. Although C.W. Krietemeyer testified that the orders in question were received at least seven days after June 30, 1976, he later admitted that, in fact, he had no specific recollection of when these orders were received. And although the contract administrator could not say for certain when the orders were mailed, he did testify that in the ordinary course of business, orders were sent out on the date they were dated and that near the end of contracts these orders were treated with particular urgency. The balance of plaintiff's evidence consists of allegations and conjecture wholly unsupported by testimonial or documentary evidence.

The court is left with unsubstantiated allegations that the orders were mailed late. These allegations are insufficient to overcome the presumption of government regularity. *See Fucik v. United States,* 228 Ct.Cl. 379, 655 F.2d 1089 (1981). They are also insufficient to carry the plaintiff's burden of proof. *Wunderlich Contracting Co.,* 173 Ct.Cl. at 199, 351 F.2d 956.

### VIII. The Government Issued Orders With Delivery Times Other Than Those Required by the Contract

Plaintiff next claims that the government failed to meet contract requirements with regard to delivery times. Plaintiff asserts that the contract limited the repair period for individual pieces of equipment to 60 days after that equipment was "placed for repair." An item was "placed for repair," and the 60 day period was triggered, it continues, when the contractor received *both* the piece of equipment and the delivery order.[22]

Plaintiff claims, however, that the government's delivery orders provided 60 days from the day the contractor received only the piece of equipment. Since the contractor generally received the delivery order after he received the actual equipment, plaintiff concludes that the government's delivery orders were at variance with the time requirements of the contract.

Plaintiff also claims that a number of delivery orders were invalid because they were inconsistent with the time requirements contained in corresponding input letters.[23] Plaintiff asserts that these input letters provided for a delivery period of 120 days and that its estimates were made in reliance on these provisions. The delivery

---

**21.** The contract's disputes clause provides that: Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

**22.** The term "delivery order" used during testimony, is used here interchangeably with the term "repair order" which is the term used in the contract. The terms were used interchangeably at trial.

**23.** Input letters accompanied the pieces of equipment given to the contractor for initial estimates of repair costs. Once the cost estimate was approved by the GSA, a delivery order, which actually authorized the contractor to begin repair work, was issued.

orders, later issued by the government provided for 60 day delivery periods. Plaintiff claims that these delivery orders were invalid because they contained the wrong delivery times.

It is clear that the contract required the delivery of repaired equipment within a 60 day period. Although questions are raised concerning the start of that 60 day period, testimony from both parties indicates that the concurrent possession of the equipment and the delivery order triggered the running of this period. Plaintiff has concluded from these points, that the government issued delivery orders that required delivery "60 days from receipt of the units," and that this constituted a compensable breach of the contract. This argument ignores, however, the importance of the second portion of the contract provision.[24] That portion permits the parties to change, by mutual agreement, the contract delivery period.

It is clear from the testimony that, in fact, discussions concerning the delivery order time were conducted throughout the life of the contract. These discussions were aimed at reaching a mutually agreeable schedule for delivery of repaired equipment. It was during these discussions that agreement on reprioritization of individual jobs and rescheduling of the delivery order times took place. According to C.W. Krietemeyer these delivery time schedules would constantly change. These discussions are of particular importance in light of plaintiff's failure to register any opposition to the delivery order times during the life of the contract. The course of dealing between the parties is entitled to great weight. *Maxwell Dynamometer*, 181 Ct.Cl. at 630, 386 F.2d at 870.

Plaintiff's claim that the delivery orders were invalid because they were different from the input letters is inconsistent with both the contract and the testimony. By the terms of the contract, the delivery order was authoritative on questions of delivery time and pricing allowances. That this was in no way altered by the parties, was shown by the testimony of C.W. Krietemeyer who testified that he was given no indication by the government that the input letters were controlling with regard to delivery times.

Finally, even assuming *arguendo* that the government did not meet contract requirements with regard to delivery times, plaintiff fails to show that it was injured as a result. It made no claim that the delivery orders delayed its performance or caused it to suffer wrongful government sanction. Plaintiff fails, with regard to the invalid delivery order claim, to establish a causal link between any errors and the subsequent late completion of G & H's performance. In fact, the only harm that could even be inferred from this discrepancy would fall on the government. Only if the government had sanctioned a longer than 60 day repair by the plaintiff, would there have been harm to the plaintiff. This the government never did.

### IX. Individual Wrongs Perpetrated by the Government for which G & H is Entitled to Damages

Plaintiff has alleged a series of contractual wrongs perpetrated by the government for which it is entitled to compensation. These wrongs range from mid-repair modifications to certain equipment, to various delays, to the switching or alteration of equipment after estimates had been submitted by G & H. The evidence submitted in support of each of these claims consisted solely of testimony by C.W. Krietemeyer.

As was the case with a number of the plaintiff's other claims, the court is left with a series of unsubstantiated allegations. These allegations were wholly unsupported by independent testimony or documentation. There is no proof of injury or even a logical connection between the alleged breaches and the late completion of performance. Alone, these allegations are

---

**24.** The contract provided in pertinent part:
Delivery of items generated under this contract ... shall be within 60 days of the date the item is placed for repair at the contractor's facility, unless a different period of time is mutually agreed to by the contractor and the ordering activity at the time the service is ordered.

insufficient to carry the plaintiff's burden of proof.

One of this series of claims does warrant a separate discussion. This claim was based on the fact that the government submitted a delivery order, requesting an estimate on certain repairs, prior to the end of the contract. The actual order for the repairs made by amendment to the original delivery order, was not submitted until after the expiration of the contract. The timing of these events was confirmed by the testimony of Robert J. Wagner, the Property Utilization Specialist involved with this contract. Plaintiff claims that this order should have been issued under Contract 66269, the follow-on contract, and not under Contract 56153, the original contract.

Here the court refers back to its discussion in Section VI. It is clear from the facts set out above that the government requested repair work that, by virtue of its timing, was outside the scope of the contract. By accepting the work order and fully performing the repair services, however, G & H waived its objection to the input of this equipment. An implied-in-fact contract was created, with the terms established by the government's work order and by plaintiff's cost estimate. Plaintiff was not entitled to payment beyond the price contained in its offer, and this was paid by the government.

## CONCLUSION

Plaintiff fails to meet its burden of proof. The court is therefore left with allegations of government breach unsupported by credible evidence. This is of particular importance in light of evidence that brought into question the credibility of the notes and records of G & H. Further, plaintiff presented no credible evidence linking defendant's alleged breaches to any actual contractual damage suffered by plaintiff. In the end, plaintiff fails to establish the facts of liability, causation or resultant injury which are fundamental to proving a compensable claim. For these reasons and the reasons set forth above,

the court holds that the plaintiff's contract claim must be denied.

The Clerk is directed to enter judgment dismissing the complaint.