**TRANSPACE CARRIERS,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1086C.

United States Court of Federal Claims.

Dec. 7, 1992.

Douglas L. Patin, Washington, D.C., for plaintiff. Stuart C. Nash, Washington, D.C., of counsel.

Allen D. Bruns and Peter G. Barber, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Sara Najjar, National Aeronautics and Space Admin., of counsel.

## OPINION

MARGOLIS, Judge.

This case is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment. Plaintiff and defendant executed a preliminary agreement setting forth the terms under which plaintiff could qualify to assume one of defendant's programs for launching objects into space. After two years of negotiating to achieve a final agreement, plaintiff claims defendant breached its duty to deal in good faith under the agreement. Plaintiff seeks $6,282,030 in direct damages and $933,033,000 in lost profits. Defendant claims that the preliminary agreement was no longer in effect and, by its own terms, precluded the recovery of damages and lost profits that plaintiff claims. After considering the record and hearing oral argument, this court finds that a material issue of fact exists with respect to defendant's duty to plaintiff to deal fairly and in good faith. On the other hand, this court finds that the agreement's terms preclude plaintiff's recovery of lost profits. Further, the court finds that the rights of the parties are governed by contract precluding recovery based on a taking theory. Accordingly, this court grants in part and denies in part defendant's motion for summary judgment.

## FACTS

Defendant, acting through the National Aeronautics and Space Administration ("NASA"), operated various space programs including the Delta Launch Vehicle program ("the Delta program"). The Delta program used Expendable Launch Vehicles ("ELVs") manufactured by McDonnell Douglas Astronautics Company ("McDonnell Douglas") to propel objects into space in support of various public and private sector missions. The introduction of the space shuttle in the early 1980s formed the basis for a presidential policy favoring transition of earlier ELV launching systems to the private sector.

On September 27, 1982, plaintiff Transpace Carriers, Inc. ("TCI") incorporated for the specific purpose of seeking to contract with NASA for commercial operation of the Delta program. TCI's president, David W. Grimes, had been NASA's project manager for the Delta program between August, 1977 and September, 1982.

TCI submitted an unsolicited proposal to NASA, dated September 27, 1982, suggesting that NASA transfer the Delta program to the private sector. In September of the following year, NASA issued a solicitation seeking proposals for commercial operation of the Delta program. According to the solicitation, "[t]he commercial operator would provide the expendable launch vehicles and services for the purpose of conducting launches of satellite systems. Full responsibility would shift from NASA to the commercial operator for the design, development and production of Delta hardware, marketing and customer services, and total launch systems operations." Def.'s Mot. Summ.J.App. at 40.

Responding to NASA's solicitation, TCI submitted a basic proposal that followed the timetable proposed by the solicitation and an alternate proposal advocating early program transition. NASA rejected both proposals because certain elements of the proposals were "fundamentally at variance with NASA's position on Delta Program commercialization." Def.'s Mot. Summ.J.App. at 95–96. TCI was, however, the only firm responding to the solicitation that proposed to operate the Delta program. As a result, NASA was "prepared to negotiate an agreement for early program transition...." Def.'s Mot. Summ.J.App. at 97.

TCI and NASA subsequently negotiated, signed, and approved a Preliminary Agreement, dated May 16, 1984, "to establish the marketing of Delta launch services on a commercial basis and to initiate production of launch vehicles in support of the commercial Delta program." Def.'s Mot. Summ.J.App. at 3. Under the Preliminary

Agreement, TCI was required to satisfy NASA that "TCI ha[d] acquired the technical, financial, and contractual capability to conduct a viable commercial Delta ELV program." Def.'s Mot.Summ.J.App. at 6. NASA also gave TCI the exclusive right to market commercial Delta launch services for the duration of the Preliminary Agreement.

For two years, the parties operated under the Preliminary Agreement while attempting to negotiate a definitive Commercialization Agreement for the Delta program. During this time, TCI worked toward assembling the financial and contractual commitments needed to gain NASA's approval for transitioning the program to the private sector. The original expiration date for the Preliminary Agreement, October 1, 1984, was extended six times by modification. The final modification signed by the parties extended the agreement's expiration date to May 31, 1986. After May 31, 1986, the parties met several times and exchanged letters. A definitive Commercialization Agreement was never signed. Finally, on October 10, 1986, NASA informed TCI that it had "adopted plans to enter into commercial agreements with the manufacturers of NASA's expendable launch systems, General Dynamics for the Atlas Centaur and McDonnell Douglas for the Delta vehicle, for their private operations." Def.'s Mot.Summ.J.App. at 203.

In an earlier decision, *Transpace Carriers, Inc. v. United States*, 22 Cl.Ct. 80 (1990), this court dismissed TCI's complaint because TCI failed to exhaust its remedies under the disputes clause of the Preliminary Agreement. NASA subsequently denied TCI's claim and TCI refiled its complaint in the United States Court of Federal Claims.

## DISCUSSION

NASA moves to dismiss the complaint or, in the alternative, for summary judgment. NASA argues that the agreement between the parties expired on May 31, 1986, when the Preliminary Agreement lapsed, and consequently it had no duty to TCI with regard to the Delta program. NASA also argues that under the terms of the agreement, TCI is precluded from recovering damages and lost profits. NASA further denies TCI's application of a taking theory to their relationship.

*Duty of Good Faith and Fair Dealing*

█ NASA had a duty to TCI to deal fairly and in good faith under the Preliminary Agreement:

> while some courts have invalidated so-called "agreements to agree," the emerging view is that an agreement which specifies that certain terms will be agreed on by future negotiation is sufficiently definite, because it impliedly places an obligation on the parties to negotiate *in good faith*. Such an obligation gives a contract certainty by allowing the courts to determine when a breach has occurred by determining whether the parties have negotiated in good faith.

*Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed. Cir.1991) (citations omitted and emphasis in original). The Preliminary Agreement contemplated that the parties would negotiate toward a definitive Commercialization Agreement. The agreement obligated NASA not to withhold unreasonably its acceptance of the conditions for program transition or its execution of the Commercialization Agreement.

█ TCI insists that a "complete Definitive Agreement had been negotiated" prior to May 31, 1986, and "[t]he only obligation left for NASA was to execute the Definitive Agreement." Grimes Aff., Pl.'s Opp'n App. at 61. Indeed, TCI proffers evidence to show that it satisfied certain conditions needed for program takeover before May 31, 1986. A letter from McDonnell Douglas indicates that it would "be pleased to continue [its] long-standing participation as the manufacturer of the Delta launch vehicle if it transitions into the commercial sector...." Pl.'s Opp'n App. at 32. A guaranty from Merchants Bank of Boston provides that $5,000,000 of termination liability coverage for NASA is available subject to a signed commercialization agreement. TCI apparently received more than

$600,000 in bridge capital from private investors prior to March 14, 1986. TCI also indicates that it contemplated a private placement through the New York firm of McKinley Square, Allsopp Securities Inc. to raise an additional $5,000,000 in bridge capital which, together with $35,000,000 in working capital from AmWest International, would have allowed TCI to start production activities. TCI further represents that it planned to use equity participation to raise $50,000,000 in additional long-term funding.

"It is an implied condition of every contract that 'neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder and delay him in its performance.'" *Petrofsky v. United States*, 203 Ct.Cl. 347, 365, 488 F.2d 1394, 1404 (1973) (citing *Wah Chang Corp. v. United States*, 151 Ct.Cl. 41, 49, 282 F.2d 728, 733–34 (1960)). On summary judgment, this court "must view the evidence in the light most favorable to the nonmoving party, and any doubt as to the existence of issues of material fact must be resolved in favor of the party opposing the motion." *Jamesbury Corp. v. Litton Industrial Products, Inc.*, 839 F.2d 1544, 1548 (Fed.Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988), *overruled on other grounds by A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (1992) (footnote omitted). Thus, while the evidence proffered by TCI does not necessarily fulfill all conditions for program transition that were specified in the Preliminary Agreement, this court finds that it is sufficient to raise the issue of whether NASA unreasonably withheld execution of a definitive Commercialization Agreement, thereby not fulfilling its responsibilities under the Preliminary Agreement.

■ Further, TCI asserts that the parties intended by their conduct to extend the Preliminary Agreement beyond the May 31, 1986 expiration date. TCI admits that no formal document authorized this extension, but asserts that NASA assured TCI a formal modification was unnecessary. TCI's best evidence of the parties' intent to extend their relationship beyond May 31, 1986 is NASA's July 10, 1986 letter to TCI which states:

> NASA is participating in several interagency processes which will impact the provision of launching services to the commercial sector by private sector providers.... The Office of Commercial Programs plans to continue working with TCI as a potential provider of private sector launch services using the Delta vehicle until these actions are completed. *This working arrangement will continue in the absence of any written agreement.*

Def.'s Mot.Summ.J.App. at 200 (emphasis added). NASA's statement can be construed as an invitation for further negotiation. In fact, NASA continued to meet with TCI during the summer of 1986 and the parties exchanged various letters on the subject of Delta commercialization. In particular, TCI presents a series of meeting notes taken by TCI personnel during June, 1986. The notes contain statements indicating that the parties had resumed discussion of the definitive agreement, and assurances from NASA of its intent to transition the Delta program to TCI.

Prior conduct of the parties also supports the inference that the May 31, 1986 date was a suggested rather than a mandatory deadline for concluding a definitive Commercialization Agreement. The evidence could be construed to show that TCI and NASA maintained an ongoing relationship for more than two years for the purpose of transitioning the Delta program to TCI. Although a formal written agreement was in place during much of this time, it appears that their relationship was sufficiently flexible that no formal contractual document may actually have been in effect during certain intervals. Five of the six amendments to the Preliminary Agreement were executed after the agreement had lapsed. The lapses extended for up to six months. In particular, evidence suggests that between June 1, 1985 and December 4, 1985 the parties may have continued to negotiate for Delta program transition in the absence of an amendment extending the period of TCI's performance. Similar-

ly, it appears that the parties may have continued to negotiate without a formal extension of the Preliminary Agreement between February 28, 1986 and May 23, 1986. Retroactive contract amendments apparently addressed these periods during which the contract lapsed.

From the foregoing it appears that the intent of the parties to remain bound by the Preliminary Agreement is a genuine issue of fact. *See Webster University v. United States*, 20 Cl.Ct. 429, 434 (1990). Viewing NASA's representations in light of the conduct between the parties before and after May 31, 1986, this court cannot say with certainty that the Preliminary Agreement was not modified by implication and prior conduct of the parties. *See G & H Mach. Co. v. United States*, 16 Cl.Ct. 568, 578 (1989) (the court may imply a contract modification from a course of conduct); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 677, 428 F.2d 1241, 1257 (1970) (contract provisions, coupled with the acts and conduct of the parties, can create an implied in fact contract between them).

TCI could have relied on past lapses in the agreement and NASA's representations in the July 10, 1986 letter. TCI's reliance may have reasonably allowed it to continue nurturing expectations of exclusive rights to market and authority to produce the Delta ELVs. TCI's reliance may have reasonably extended to encompass the period during which NASA adopted plans to transition the program to McDonnell Douglas. *See Jackson v. United States*, 12 Cl.Ct. 363, 365–66 (1987).

Whether TCI can prevail on the theory that NASA breached its duty of good faith and fair dealing remains to be seen; however, genuine issues of fact exist in this regard. Thus, the court is unable to say as a matter of law that NASA properly abrogated its contractual responsibilities under the Preliminary Agreement on May 31, 1986 thereby retaining no duty towards TCI during the period in question. *See Jamesbury Corp.*, 839 F.2d at 1548.

*Lost Profits*

■ TCI's claim for lost profits is unequivocally precluded by the language of the Preliminary Agreement:

Marketing and production activities contemplated by this Agreement are the responsibility of TCI. NASA shall not be responsible or liable for damage arising out of TCI's commercial Delta activities. To the extent that a risk of Damage, as defined below, caused by TCI or NASA or a third party is not dealt with expressly in this Agreement, TCI assumes responsibility for such risk, whether negligence is involved or not, and agrees to indemnify the U.S. Government for any liability arising from such risk....

For purposes of this Article, the following definitions shall be applicable:

....

b. "Damage" shall mean bodily injury or death of any person, damage to or loss of any property, and loss of revenues or profits or other direct, indirect, or consequential damages arising therefrom.

Def.'s Mot.Summ.J.App. at 15. The agreement goes on to state:

To the extent that a risk of damage is not dealt with expressly in this Agreement, the U.S. Government's liability to TCI, and TCI's liability to the U.S. Government arising out of this Agreement, whether or not arising as a result of an alleged breach of this Agreement, shall be limited to direct damages only and shall not include any loss of revenue, profits, or other indirect or consequential damages.

Def.'s Mot.Summ.J.App. at 17.

■ The interpretation of contract language is a question of law that may be determined by summary judgment. *Government Systems Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir. 1988); *see Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). This court finds no merit in TCI's argument that "Damage" required death, injury, or property loss. On the contrary, the court finds that the term "Damage" contemplated loss of revenues or profits by TCI. Further, the agreement addresses the eventuality of lost profits caused by an alleged breach of the Preliminary Agree-

ment and explicitly denies this type of damage. Accordingly, this court grants defendant's motion for summary judgment on the issue of TCI's lost profits.

### Fifth Amendment Taking

TCI asserts its Fifth Amendment taking claim as an alternative to its breach of contract claim, and acknowledges that recovery on the breach of contract claim would preclude recovery on a taking theory. *See Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 769, 572 F.2d 786, 817–18 (1978). TCI's ability to prevail on its breach of contract claim is uncertain, however, meriting discussion of the taking claim. *See id.*

■ TCI alleges that NASA's actions resulted in a taking of its contract rights under the Preliminary Agreement for a public purpose without just compensation. Interference with a property right that parties created voluntarily by contract, however, generally gives rise to a claim for breach of contract. *J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969). NASA acted in a proprietary capacity, not a sovereign capacity, in negotiating with TCI for the transfer of the Delta program. Thus, TCI's remedy must be directed at NASA in its proprietary capacity, through the contract vehicle. *See*

*Sun Oil Co.*, 215 Ct.Cl. at 770, 572 F.2d at 818. The Preliminary Agreement adequately expresses the rights and duties of the parties, and that document fully addresses the eventualities at issue before this court. Defendant's motion for summary judgment on this theory of liability is therefore granted.

### CONCLUSION

This court finds that a material issue of fact exists with respect to defendant's duty to plaintiff to deal fairly and in good faith. The court finds, however, that the agreement's terms preclude plaintiff's recovery of lost profits. Further, the court finds that since the rights of the parties are governed by contract, recovery based on a taking theory is precluded. Accordingly, defendant's motion for summary judgment is granted in part and denied in part. The parties have 120 days from the date of this opinion in which to complete discovery.